# UNITED STATES DISTRICT COURT
### for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ▮▮▮▮▮▮▮▮ et al. | ) | Case No. 24-M-337 (SCD) |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ February 2018 _____ in the county of _____ Milwaukee _____ in the _____ Eastern _____ District of _____ Wisconsin _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, 18 U.S.C. § 2 | Possession with intent to distribute, distribution of controlled substances and conspiracy to possess with intent to distribute and distribution of cocaine and methamphetamine, Schedule II controlled substances; and, aiding and abetting the aforementioned offenses. |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Jeffrey Hale, DEA TFO
_Printed name and title_

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date: _____

_____
_Judge's signature_

City and state: _____ Milwaukee, Wisconsin _____

Hon. Stephen C. Dries, U.S. Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT

## I.     INTRODUCTION

I, Jeffrey Hale, being duly sworn, do depose and state as follows:

1.      I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) and have been a sworn officer in the State of Wisconsin for approximately 28 years.  I am currently assigned to the Waukesha County Drug Task Force.  I am also a federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA).  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.      In connection with my official DCI and DEA duties, I investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 924(c), 1956 and 1957; and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963.  I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.  I have participated in the execution of multiple federal search warrants.

3.      I have received training in the area of controlled substances investigations, money laundering, financial investigations, and various methods that

1

drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal controlled substances laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States currency, vehicles, real estate, and jewelry from individuals involved in narcotics trafficking.

4. I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

5. Through training, experience, and discussions with other experienced agents:

a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, methamphetamine, ecstasy, cocaine, and crack

2

cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

      c.     I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

      d.     I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

      e.     I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

      f.     I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

3

g.     I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, and receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.     I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers.  These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.     I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers.  These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

4

j.     I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.     I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to:  domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l.     I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

m.     I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs.  These traffickers usually maintain these photographs in their possession; and

n.     I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target.  The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money.  When an informant is used, he/she is searched for

5

contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

o. Additionally, I know that most telephone calls made by the informant are under the direction and control of case agents are recorded. Further, I know that a controlled buy can also be defined as a law enforcement operation where, under law enforcement direction, an informant utilizes the United States Postal Service (USPS), UPS, or FedEx as a means to deliver the desired quantities of controlled substances to an individual.

6. In addition, during the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7. Pursuant to my official duties, I am submitting this affidavit in support of an application for a criminal complaint, arrest warrants, and a search warrant for

6

property described in Attachment A, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1), and 846, Distribution of, and Possession with Intent to Distribute, Controlled Substances; Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances; and, Title 18, United States Code, Section 2.

8.     I am personally involved in the investigation of the offenses discussed in this affidavit and I am familiar with all aspects of this investigation. The statements contained in this affidavit are based on my knowledge and, in part, information provided by other law enforcement officers (LEOs) including: (a) my personal knowledge and observations derived from participation in this investigation; (b) review of oral and written reports that I have received directly or indirectly from other LEOs about this and other drug-trafficking investigations; (c) discussions I personally had concerning this investigation with other experienced drug-trafficking investigators; (d) physical surveillance by the DEA and local law enforcement agencies, the results of which have been reported to me directly or indirectly; (e) public records; (f) review of telephone toll records, pen register and trap and trace information, and telephone subscriber information; (g) information provided by confidential sources working for the DEA, DCI, and the Waukesha County Drug Task Force; (h) consensually-recorded phone calls between confidential sources; (i) controlled purchases of methamphetamine and cocaine; (j) review of driver's license and automobile registration records; (k) records obtained from law enforcement

7

databases; (l) my training and experience as a DEA TFO; (m) the training and experience of other LEOs involved in this investigation; (n) and United States Postal service records.

9.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10.    The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing search warrants and a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above, occurred and that probable cause exists to believe that the property described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

## II. INDIVIDUALS FOR WHOM A CRIMINAL COMPLAINT IS SOUGHT

|   | NAME | DATE OF BIRTH |
|---|------|---------------|
| 1 | Chauncey Terrion HARVEY, a/k/a Chauncey, a/k/a Clec | ██/1984 |
| 2 | Alexander Michael DAY | ██/1988 |
| 3 | Vanessa Lynn OLSON | ██/1991 |
| 4 | Miles Towner ARNOLD | ██/1987 |
| 5 | Andrew Frank PATANAPAIBOON, a/k/a Patana | ██/1990 |
| 6 | Rebecca Jolene SHAFFER | ██/1988 |

## III. PROPERTY FOR WHICH A SEARCH WARRANT IS SOUGHT

11.     For the reasons discussed herein, there is probable cause to believe that located at and in the following property, more fully described in Attachment A and referred to as "PREMISES," are items that constitute evidence of drug trafficking, including violations of Title 21, United States Code, Sections 841 and 846; and Title 18 United States Code, Section 2.

> ██ N. Pine Street, ██, Burlington, WI – Primary residence of Rebecca SHAFFER. A check with WE Energies revealed that an open account has existed at this address in the name of Rebecca SHAFFER, listing telephone number ██-3281 since April of 2012.

12.     The following sub-sections set forth various types of information obtained during this investigation regarding the locations and persons described above.  Such information includes but is not limited to the following: (1) information

9

obtained from confidential sources; (2) electronic surveillance; (3) recorded conversations; and (4) physical surveillance.

13.    This investigation was initiated in February of 2023. To date, case agents have determined that a group of individuals, including, but not limited to Alexander DAY, Chancey HARVEY, Vanessa OLSON, Miles ARNOLD, Andrew PATANAPAIBOON, and Rebecca SHAFFER, both known and unknown, are involved in a drug trafficking organization (DTO) that distributes Cocaine, "Adderall" pills (containing methamphetamine), Methylenedioxymethamphetamine (commonly known as "ecstasy"), and Oxycodone in the Eastern District of Wisconsin. The DTO obtains cocaine from unknown source(s) in Texas and elsewhere, and "Adderall" pills from Chauncey HARVEY, who operates in the District of Arizona. The investigation has further revealed that DTO members mail drugs, using the United States Postal Service (USPS), to the Milwaukee, Wisconsin area for distribution.

## IV.    PROBABLE CAUSE

### A.  Background and Summary of Investigation

15.    In February 2023, members of the Drug Enforcement Administration (DEA) and the United States Postal Inspection Service (USPIS) initiated an investigation into individuals distributing large quantities of cocaine and methamphetamine throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement authorities identified the individual spearheading the DTO in Mesa, Arizona, as Alexander M. DAY (DAY) (a/k/a "Alex"). Upon further investigation, authorities learned that, beginning in at least January of 2018, DAY shipped bulk

Case 2:24-mj-00337-SCD   Filed 02/22/24   Page 11 of 125   Document 7

quantities of cocaine and methamphetamine pills (referred to by DTO members as "Adderall" pills) to the Eastern District of Wisconsin and elsewhere.

16. DAY obtained multiple kilograms of cocaine from sources in the Brownsville, Texas area, some of which were sent to the Eastern District of Wisconsin, where they were distributed by members of the DAY DTO. DAY, along with a partner, Miles T. ARNOLD (ARNOLD), packaged and sent the cocaine through the United States Postal Service to numerous addresses in the greater Milwaukee, Wisconsin, area that are associated with the DTO. This has been confirmed by the seizure and search of postal packages, which contained cocaine.

17. Additionally, the investigation revealed that the DAY DTO obtains thousands of "Adderall" pills containing methamphetamine from Chauncey T. HARVEY (HARVEY), who resides in Mesa, Arizona, and that HARVEY is the supplier of the "Adderall" pills for the DAY DTO. HARVEY, DAY and/or DAY's on and off girlfriend, Vanessa L. OLSON (OLSON), ship these Adderall pills to the Eastern District of Wisconsin and elsewhere. OLSON also currently resides in the Mesa, Arizona area. This has been confirmed by the seizure of United States Postal packages shipped to the Milwaukee area by HARVEY, DAY and/or OLSON, as well as recorded conversations between a confidential source, CS-1, and DAY.

18. DAY DTO members collect the packages that are sent to various DTO addresses in the Milwaukee area. Thereafter DTO members prepare the cocaine and methamphetamine pills for distribution. Members of the DTO, including CS-1, CS-2, and CS-3, distributed the cocaine and methamphetamine pills to mid-level

distributors of the DTO in the greater Milwaukee, Wisconsin area. These mid-level distributors subsequently distributed the cocaine and methamphetamine pills to numerous customers in the greater Milwaukee, Wisconsin, area.

19.     Case agents have identified the mid-level distributors, in part, for the DTO as Andrew F. PATANAPAIBOON (PATANAPAIBOON) (a/k/a "Patana") and Rebecca J. SHAFFER (SHAFFER) who distribute methamphetamine pills on behalf of the DTO.

20.     The investigation to date reflects that the DAY DTO has sent at least 75 packages, believed to contain cocaine and/or methamphetamine, which have been delivered by the United States Postal Service, to numerous different addresses in the Eastern District of Wisconsin.

21.     DAY and OLSON use aliases and addresses with no current ties to themselves to ship the packages. For example, sender names on the packages have included "███████████" and "███████████," among others. Examples of the sending addresses have included former addresses for DAY and/or OLSON. For example, sender addresses on the packages have, in part, included "███ E. Keim Drive, Scottsdale, Arizona" and "███ E. Mary Sharon Drive, Scottsdale, Arizona."

22.     Despite their use of alias and incorrect sending addresses, case agents have been able to confirm that DAY, OLSON, and/or HARVEY mailed the above-referenced packages because (1) DAY, OLSON and/or HARVEY have sent the confidential sources photographs of the USPS shipping receipts which contained the tracking numbers for the parcels; and (2) video surveillance has captured DAY,

12

OLSON and/or HARVEY mailing parcels on certain dates, which parcels have been identified as the ones mailed to CS-1 and/or CS-2.

23. Based upon their training, experience, and familiarity with the investigation, case agents believe that the DAY DTO has distributed in excess of five kilograms of cocaine, a Schedule II controlled substance, and in excess of 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

24. Upon receipt and distribution of the controlled substances, the DTO utilizes frequent cash deposits made at various ATMs amongst accounts associated with DTO members, as well as cash applications such as Zelle, PayPal, and other similar cash applications. Furthermore, on at least one occasion in 2021, case agents believe DAY traveled to Milwaukee, Wisconsin, to obtain a bulk cash payment for cocaine that was to be supplied to CS-3.

25. The investigation has also revealed that DAY assists the DTO with laundering drug proceeds through bank accounts and LLCs, including DAY's business, named Detail Boys, LLC. More specifically, through an analysis of bank records, case agents have determined that DAY deposits suspected drug proceeds for the DTO, deposits those proceeds into a business account, and subsequently transfers that money to personal bank accounts where it is then sent to various individuals, including but not limited to HARVEY.

26. While the investigation to date has revealed that DAY primarily uses his cellular telephone, ████-1062, to conduct DTO business, case agents also

believe DAY, OLSON and HARVEY also communicate with some DTO members through third-party phone applications, including Signal and WhatsApp which feature end-to-end encryption and are currently unable to be intercepted by law enforcement authorities. Moreover, the audio features of these applications allow the user of the application to place voice calls in addition to other features of the application such as texting and/or messaging capabilities. Further, the investigation has revealed that OLSON uses the Signal platform to communicate with CS-2. The investigation has also revealed that DAY uses various social media accounts in furtherance of the DTO's activities.

27.     The investigation has revealed that OLSON primarily uses her cell phone, ██████-0755. ARNOLD primarily uses his cell phone, ██████-2382, and HARVEY primarily uses his cell phone, ██████-1155, to conduct drug related business in furtherance of the DTO.

## B.     Confidential Source Information

### i.     Information Obtained from Cooperating Source One (CS-1)[1]

28.     On February 16, 2023, the Waukesha County Drug Task Force was contacted by the United States Postal Inspection Service (USPIS) requesting assistance. Postal Inspectors advised case agents that the Inspectors had been tracking three parcels from Arizona all mailed on February 15, 2023, that were sent

---

[1] Beginning in February of 2023, a confidential source (CS-1) made statements against CS-1's penal interest. CS-1 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS-1 has been corroborated by information known to case agents gathered during the course of this investigation. According to law enforcement databases, CS-1 has no prior criminal convictions. Within the context of the information detailed and relied upon for purposes of this affidavit, law enforcement believes CS-1 is credible and CS-1's information reliable.

14

to the Eastern District of Wisconsin. One parcel bore a handwritten label addressed from "█████████ ████ E Keim Dr Scottsdale, AZ 85032." The handwritten label was addressed, in part, to "███ Redtail Dr Hartford WI 53027." The postage paid was $28.75.

29. The other two packages were of a similar size and weight, bearing handwritten labels sent from "████████ ████ ███ E Keim Dr Scottsdale, AZ 85032," and addressed to "J██ F ██████████ Dr Pewaukee, WI 53072." Inspectors seized and maintained custody of the parcels, and on February 16, 2023, a USPIS postal inspector received warrants from the Honorable William E. Duffin, United States Magistrate Judge for the Eastern District of Wisconsin, to open the three seized parcels.

30. On February 16, 2023, Inspectors opened the three suspect parcels and identified the contents of the two parcels addressed to ██████████ Dr., Pewaukee, Wisconsin 53072 as clear vacuum sealed bags containing orange elliptical/oval pills imprinted with "b 974" on one side and "30" on the opposite side. Investigators subjected a sample of these pills to a TruNarc Handheld Narcotics-1 Analyzer to field test the pills, and the test result was positive for the presence of methamphetamine.

31. Inspectors then weighed the pills while still contained within their clear vacuum sealed bags. The weighed bags were 194 gross grams and 234 gross grams, respectively, totaling 428 gross grams for the parcels addressed to ██████████ Dr., Pewaukee, Wisconsin 53072.

15

32.     Inspectors then examined the parcel addressed to ███ Redtail Dr., Hartford Wisconsin 53027.  Inspectors performed similar investigative steps as outlined above for the parcels addressed to ████████ Dr., Pewaukee, Wisconsin 53072.  Thereafter, Inspectors determined that the parcel contained 35 pills, which, according to investigators from the Washington County Sheriff's Department, tested positive for methamphetamine.

33.     Inspectors, working in conjunction with case agents, prepared to make controlled deliveries of the three parcels to the intended recipient addresses of ████████ Dr., Pewaukee, Wisconsin 53072, as well as ███ Redtail Dr., Hartford, Wisconsin 53027.

34.     On February 17, 2023, investigators executed an anticipatory search warrant at ████████ Dr., Pewaukee, Wisconsin. This search warrant was authorized by Waukesha County Circuit Court Judge Paul Bugenhagen.

35.     The search resulted in the seizure of numerous items of drug paraphernalia, pills which have not yet been identified to date, approximately 38.9 grams of cocaine, approximately 19 grams of methamphetamine, approximately 54.6 grams of methylenedioxymethamphetamine, and approximately 34 grams of THC/THC gummies.

36.     Additionally, on February 17, 2023, CS-1 was arrested in Pewaukee, Wisconsin. Upon arrest, CS-1 provided information regarding Alex DAY.

37.     During CS-1's *Mirandized* interview on February 17, 2023, case agents presented CS-1 with photographs of the pills that were contained within the parcels.

16

In response, CS-1 identified these pills as Adderall.  Case agents asked CS-1 if he/she recognized either the sender's name or address on the parcels that were delivered to ███████████ Dr., Pewaukee, Wisconsin during the controlled delivery to which CS-1 stated that he/she did not. CS-1 confirmed that the listed parcels recipient address, ███████████ Dr., Pewaukee, Wisconsin 53072, is his/her address; however, CS-1 did not know the listed intended recipient on the parcels, "John F." When case agents asked CS-1 whom he/she knows from Scottsdale, Arizona, or the Scottsdale area, CS-1 stated, "Alex DAY."

38.    CS-1 stated that DAY previously resided in Milwaukee, Wisconsin until approximately nine years ago when DAY moved to Arizona. CS-1 stated that DAY currently resides with his fiancé named "Vanessa." CS-1 identified a photograph of Vanessa L. OLSON as DAY's fiancé, "Vanessa."  CS-1 further stated that DAY owned a detailing company in Arizona, which CS-1 believed to be named "Detail Boys." CS-1 indicated that he/she and DAY communicate mainly through text messaging, and CS-1 and DAY frequently discuss drug transactions in these messages. CS-1 stated that DAY was able to obtain for CS-1 "whatever" CS-1 wanted and was able to supply significant quantities of those controlled substances to CS-1.

39.    Regarding the two parcels delivered during the controlled delivery that day, CS-1 stated that DAY contacted CS-1 a few days prior asking if CS-1 would be willing to receive parcels at his/her residence. CS-1 agreed to accept the parcels for DAY. CS-1 stated that one of the parcels was designated for CS-1 and the other parcel was for someone else, but at DAY's request CS-1 had agreed to accept both parcels at

17

CS-1's residence. CS-1 stated that sometimes DAY, himself, would come to CS-1's residence in person to retrieve parcels after they have been delivered; other times DAY would send different people to CS-1's residence to retrieve the parcels. CS-1 stated that while he/she knew that the parcels were coming to his/her residence and that both of the parcels contained drugs, CS-1 did not know the exact quantity or weight of drugs contained in the parcels. CS-1 stated that DAY had not instructed CS-1 regarding the other parcel, and that DAY would often give CS-1 instructions at a later time. CS-1 stated that the parcels CS-1 received from DAY usually contained cocaine and/or pills, and that CS-1 had last received a parcel from DAY approximately four weeks prior to the interview.

40.     Case agents asked CS-1 about his/her activities earlier that day, and CS-1 stated that he/she dropped off 20 "Adderall pills" (later determined by case agents to contain methamphetamine, not Adderall) and "some cocaine" to two different customers in Milwaukee, Wisconsin. CS-1 stated that the pills and cocaine were supplied to CS-1 by DAY.

41.     CS-1 further related to case agents that once CS-1 received the postal parcels from DAY, CS-1 both used and distributed the cocaine and methamphetamine pills. CS-1 stated that "a handful" of people were involved in DAY's drug trafficking organization, and that CS-1 did not know some of those members. DAY would send parcels to CS-1's residence, and then DAY instructed those individuals to retrieve the parcels shipped by DAY at CS-1's residence. CS-1 identified the methamphetamine

18

pills contained in the parcels from the controlled delivery that day as "Adderall" pills.[2]

42.     Case agents conducted numerous proffered interviews of CS-1 beginning around March of 2023 and continuing through August of 2023.  CS-1 stated that CS-1's source of supply for various drugs, including cocaine and "Adderall pills" (CS-1 did not realize that the pills actually consisted of methamphetamine), is Alex DAY, who resides somewhere near the area of Scottsdale, Arizona. CS-1 has communicated with DAY through two phone numbers, which were identified as a "regular phone number" ████-1062, and an additional "burner phone number" ████-0627. CS-1 stated that CS-1 and DAY primarily communicated on ████-1062. Case agents have since learned that the "burner phone number," ████-0627, is inactive.

43.     CS-1 stated that CS-1 began obtaining controlled substances from DAY approximately five years ago. CS-1 obtained cocaine, "Adderall pills" and Oxycodone pills from DAY.

44.     CS-1 stated that prior to loaning DAY $15,000, discussed below, CS-1 believed that DAY was sourced with cocaine from an unknown local supplier in Arizona. After the loan, DAY began traveling to Brownsville, Texas to obtain

---

2. Case agents, using the Drugs.com pill identifier public database, searched the pill imprint, color and shape for the pills seized during this investigation.  A search of this database by case agents identified by physical appearance the pills seized during this investigation as a pharmaceutical drug by the name of Adderall. However, pharmaceutically manufactured Adderall pills contain the active ingredients of Amphetamine and Dextroamphetamine, not methamphetamine. As detailed throughout this Affidavit, each parcel containing pills sent by DAY and/or OLSON, and HARVEY identified as "Adderall" contained methamphetamine. Therefore, the pills advertised by DAY and/or OLSON as "Adderall" are not genuine Adderall pills and are manufactured outside of lawful manufacturing facilities.   For the remaining Affidavit, while confidential sources refer to receiving "Adderall" pills; rather, the recipients received pills where methamphetamine was the active ingredient.

kilogram quantities of cocaine from a new source of supply. CS-1 did not know from whom DAY obtained the kilograms of cocaine but knew that DAY would travel from Arizona to Texas every two to three months in order to obtain kilograms of cocaine. DAY then utilized the United States Postal Service to mail the kilograms to various locations, including but not limited to CS-1's residence in Wisconsin.

45.     CS-1 stated that in addition to communicating with DAY on his "regular phone," CS-1 also communicated with DAY through the Signal telephone application, an end-to-end encryption application. CS-1 further stated that the telephone number associated with DAY's Signal telephone application is also ███████-1062, DAY's main number. CS-1 also related that the communication between CS-1 and DAY was not strictly limited to this number, and that CS-1 and DAY also communicate using various social media platforms.

46.     CS-1 stated that DAY has shipped CS-1 cocaine and "Adderall pills," methylenedioxymethamphetamine (commonly known as "ecstasy"), and Oxycodone to CS-1 to be distributed in the Milwaukee, Wisconsin area. After obtaining the various controlled substances from DAY, CS-1 distributed the substances received from DAY to various known customers in the Milwaukee, Wisconsin area.

47.     Additionally, CS-1 stated that DAY travels to California, where DAY meets with an unknown source of supply for "hundreds" of THC vape cartridges, which are then traded in Brownsville, Texas for cocaine.

48.     CS-1 stated that DAY related partial information about DAY's activities in Brownsville, Texas to CS-1. CS-1 neither knows DAY's source of supply nor any

other identifying information for the source. CS-1 believes, based on communications with DAY, that the Texas source of supply is connected to a cartel. DAY has told CS-1 that DAY pays between $22,000 to $24,000 per kilogram to the Brownsville, Texas source of supply. CS-1 further stated that DAY was shipping controlled substances, including but not limited to kilograms of cocaine, to unknown individuals in Michigan and Minnesota. CS-1 stated that DAY has been involved in large-scale controlled substance distribution for "years."

### ii. Information Obtained from Cooperating Source Two (CS-2)[3]

49.     On May 4, 2023, case agents conducted an interview of CS-2 regarding this investigation. CS-2 stated that CS-2 met Vanessa OLSON (DOB XX/XX/91) approximately four or five years ago at a bar in downtown Milwaukee. OLSON informed CS-2 that OLSON had "Addys" (short for Adderall, which through the investigation, has been determined to contain methamphetamine) for sale. CS-2 stated that CS-2 and OLSON either exchanged telephone numbers or Facebook messenger accounts, but CS-2 could not remember which method of communication was exchanged at that time.

50.     CS-2 stated that the first transaction with OLSON occurred approximately 1 ½ to 2 years ago, and at that time, OLSON was still residing in the Milwaukee area. CS-2 recalled that this transaction was for approximately 20

---

[3] Beginning in March of 2023, a confidential source (CS-2) made statements against CS-2's penal interest. CS-2 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS-2 has been corroborated by information known to case agents gathered during this investigation. According to law enforcement databases, CS-2 has been convicted of several traffic offenses; however, CS-2 has never been convicted of a crime. Within the context of the information detailed and relied upon for purposes of this Affidavit, law enforcement authorities believe CS-2 is credible and CS-2's information reliable.

21

Adderall pills, but CS-2 could not remember the price OLSON charged. CS-2 recalled meeting OLSON in a parking lot somewhere within the City of Milwaukee, where CS-2 purchased 20 Adderall pills from OLSON.

51.     CS-2 stated that CS-2 and OLSON conducted a couple more Adderall transactions after the initial transaction, all of which were for roughly the same number of pills. CS-2 could only recall that the transactions occurred within the City of Milwaukee and could not recall the specifics of those transactions.

52.     CS-2 stated that CS-2 then stopped purchasing Adderall pills from OLSON for approximately six months.

53.     After about six months, CS-2 again contacted OLSON to purchase another 20-25 pills. CS-2 stated that at that time, OLSON was still residing in the Milwaukee area but told CS-2 that OLSON was in the process of moving to Arizona. OLSON agreed to sell CS-2 the pills, and CS-2 met OLSON in a parking lot within the City of Milwaukee, where CS-2 recalled paying cash for approximately 20-25 pills.

54.     CS-2 stated that sometime after this transaction, OLSON moved to Arizona. CS-2 neither knew exactly when OLSON moved to Arizona, nor did CS-2 know exactly where in Arizona OLSON moved.

55.     Once OLSON moved to Arizona, CS-2 began receiving shipments of pills from OLSON that were sent to CS-2 through the United States Postal Service. CS-2 stated that these shipments were always sent to CS-2's residence and consisted of 20-25 pills per shipment. CS-2 stated that since OLSON now resided in Arizona, CS-2 paid OLSON for the pills that OLSON shipped through OLSON's PayPal account,

which CS-2 identified as ███████ CS-2 advised that the cost of the pills varied, and OLSON always provided CS-2 with the cost of each pill. Not only was CS-2 responsible for the cost of the pills, but also for the cost of shipping the pills to CS-2.

56.     CS-2 stated that in communications with OLSON, OLSON also offered to sell CS-2 opioid pills, but CS-2 had never purchased opioid pills from OLSON. CS-2 further stated that CS-2 believed OLSON has access to numerous other controlled substances because OLSON has specifically told CS-2 that if CS-2 "ever needed anything else, let me know."

57.     CS-2 stated that CS-2 has only communicated with OLSON via one telephone number, and that telephone number is used through the Signal telephone application. CS-2 identified OLSON's Signal telephone number as ██████-0755.

58.     CS-2 stated that CS-2 only communicates with OLSON for the purpose of obtaining Adderall pills, and that CS-2 and OLSON do not communicate socially. CS-2 provided case agents with the PayPal history between CS-2 and OLSON, and a review of the PayPal history provided by CS-2 revealed a total of thirteen separate transactions beginning in June of 2020 through February of 2023 that remained on CS-2's PayPal account history. CS-2 stated that CS-2 had purchased 20-30 Adderall pills on average of one to two times per month from OLSON recently.

### iii. Information Obtained from Cooperating Source Three (CS-3)[4]

59. In late May of 2023, case agents conducted an interview of CS-3 regarding this investigation.

60. The first drug transactions between CS-3 and Alex DAY occurred around 2020 or 2021 when DAY inquired whether CS-3 needed "anything." CS-3 specifically recalled that DAY offered CS-3 cocaine and Adderall pills. During this conversation, DAY also informed CS-3 that DAY had "mushrooms" for sale. CS-3 recalled that at the time of this conversation, DAY was residing in Arizona. Further, CS-3 stated that for the entirety of the time that CS-3 conducted drug transactions with DAY, DAY resided in Arizona. CS-3 believes that DAY resides in Scottsdale, Arizona with Vanessa OLSON, DAY's girlfriend.

61. CS-3 mainly communicated with DAY via the Signal telephone application. CS-3 stated that CS-3 had deleted DAY's number from Signal. CS-3 did not have a current phone number for DAY because they had not been in communication for a long period of time.

62. CS-3 stated that DAY returned to the Milwaukee area to visit sometime in 2021 (CS-3 could not recall the exact time frame). CS-3 wanted to purchase approximately nine ounces of cocaine from DAY while DAY was in the Milwaukee area. CS-3 recalled giving DAY approximately $9,000 to $10,000 in cash, which was

---

[4] Beginning in May of 2023, a confidential source (CS-3) made statements against CS-3's penal interest. CS-3 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS-3 has been corroborated by information known to case agents gathered during this investigation. According to law enforcement databases, CS-3 has no prior criminal convictions. Within the context of the information detailed and relied upon for purposes of this Affidavit, law enforcement authorities believe CS-3 is credible and CS-3's information reliable.

paid in advance to DAY for the cocaine. DAY ended up supplying CS-3 with between two to three ounces of cocaine, but the cocaine was of bad quality. CS-3 told DAY that CS-3 wanted CS-3's money returned because the quality of the cocaine was poor. DAY told CS-3 that more cocaine was coming soon, and that DAY would replace the bad cocaine. CS-3 stated that the time "drug out" and DAY kept telling CS-3 that DAY would "make it right" for CS-3 but the better cocaine was never supplied to CS-3. DAY then told CS-3 that DAY would make up the paid cash by giving CS-3 mushrooms or Adderall pills instead of the cocaine.

63.     CS-3 stated that after this conversation, CS-3 ordered approximately eight ounces of mushrooms from DAY and DAY indicated he would ship them to CS-3 through the United States Postal Service. CS-3 stated that when the package arrived it was empty, and that no mushrooms were contained in the package. CS-3 contacted DAY, and DAY stated that he would send another package of mushrooms to CS-3. DAY did not know why the package was empty. Shortly thereafter, CS-3 received a letter from the United States Postal Service saying that a package addressed to CS-3's address had been intercepted and the contents were suspected illegal drugs. CS-3 stated that after receiving this letter, CS-3 never responded to the postal service to inquire about the package since CS-3 knew the package likely contained the mushrooms from DAY.

64.     CS-3 stated that DAY then began sending Adderall pills to CS-3 to make up for the money supplied for the cocaine that DAY still owed CS-3. CS-3 recalled three separate pill transactions with DAY.

25

65.     The first transaction totaled 100 Adderall pills and CS-3 recalled this transaction to be sometime in late 2021 or early 2022. CS-3 stated that the package was shipped by DAY to another residence in Milwaukee. CS-3 stated that it was DAY's idea to ship the package to this alternative residence because CS-3 didn't want to risk the postal service potentially intercepting the package again. CS-3 stated that no money was paid to DAY for this package because DAY owed CS-3 money from the cocaine. CS-3 stated that for each of the pills, DAY deducted $5 from the money CS-3 had previously supplied to DAY for the cocaine.

66.     The second transaction totaled 500 Adderall pills, and CS-3 recalled this transaction to have occurred a few weeks after the first one. CS-3 could not recall if this transaction occurred in person while DAY was in Milwaukee or if this transaction was conducted through the mail. CS-3 stated that if the transaction occurred through the mail, the package would not have been sent to CS-3's residence; instead, it would have been sent elsewhere. The person receiving the package shipped from DAY would have dropped the package off at CS-3's garage, and CS-3 would have provided the garage code to DAY. In turn, DAY would have provided the garage code to whomever dropped off the package.

67.     The third transaction with DAY occurred in early 2022 for between 500 and 1,000 Adderall pills. CS-3 recalled that this particular package was dropped off by the post office on a porch at an unknown residence in West Allis or Milwaukee. CS-3 picked up the package, which had been placed between the screen and entry door of the residence. CS-3 had no further information about this residence.  CS-3

26

stated that DAY had provided the information to CS-3 as to where to pick up the package.

68.    CS-3 stated that after the third transaction, DAY repaid CS-3 for the money originally supplied for the cocaine. CS-3 stated that CS-3 and DAY had "a falling out" due to CS-3's belief that DAY was difficult to deal with and unreliable.

69.    CS-3 then "took a break" from dealing with DAY. Nevertheless, DAY continued messaging CS-3, asking if CS-3 needed anymore pills.

70.    CS-3 stated that around the end of 2022, DAY's girlfriend, Vanessa OLSON, contacted CS-3.  OLSON indicated that CS-3 would be able to deal with OLSON instead of DAY if CS-3 wanted more Adderall pills. CS-3 stated that CS-3 believed that OLSON was involved in drug trafficking with DAY. CS-3 and OLSON then began communicating about a possible transaction. CS-3 communicated directly with OLSON via the Signal telephone application and identified OLSON's Signal telephone number as ██████-0755.

71.    Around the end of 2022, CS-3 agreed to conduct a transaction with OLSON. CS-3 stated this transaction was for 1,000 Adderall pills, which CS-3 recalled OLSON charging $4.50 or $5.00 per pill. CS-3 stated that CS-3 paid OLSON via her PayPal account. CS-3 could not remember to where OLSON shipped this package but stated that the package arrived safely, and that the transaction was successful.

72.    Approximately one or two months later, CS-3 again conducted another transaction with OLSON. CS-3 stated this transaction was also for 1,000 Adderall

pills, which CS-3 recalled were the same price as the prior transaction with OLSON. CS-3 stated that CS-3 again paid OLSON via her PayPal account. CS-3 recalled that this parcel may have been sent to CS-3's residence, but CS-3 could not specifically recall where it was sent. CS-3 stated that this transaction was successful as well.

73.     In February of 2023, CS-3 conducted another 1,000 Adderall pill transaction with OLSON. On this occasion, the package was earmarked for delivery at a residence in Pewaukee, Wisconsin. However, CS-3 stated that this package "went missing" and never arrived at the residence. Case agents know that this parcel was one of the parcels delivered to this residence by law enforcement on February 17, 2023, and searched pursuant to the federal warrant.

74.     CS-3 stated that CS-3 was aware that DAY also sent Adderall pills to "Andrew Patana," whom case agents know to be Andrew PATANAPAIBOON, among others.

75.     CS-3 stated that during 2021 and 2022, CS-3 obtained Adderall pills from DAY and then supplied Andrew PATANPAIBOON. CS-3 stated that PATANAPAIBOON usually obtained 100 Adderall pills at a time from CS-3; CS-3 charged PATANAPAIBOON approximately $8 per pill. CS-3 stated that on a couple of occasions, PATANAPAIBOON obtained 500 Adderall pills from CS-3 at a time.

76.     CS-3 stated that sometimes CS-3 "fronted" (i.e., provided on consignment) the pills to PATANAPAIBOON and sometimes PATANAPAIBOON paid for the pills in cash on delivery. CS-3 stated that CS-3 sold the majority of the pills to PATANAPAIBOON that CS-3 had obtained from DAY and OLSON.

28

77.     CS-3 stated that PATANAPAIBOON also purchased ounces of cocaine and "Molly" from CS-3 in the past. CS-3 stated that PATANAPAIBOON also received shipments of Adderall pills from DAY through the mail and that PATANAPAIBOON dealt directly with DAY in the past. PATANAPAIBOON told CS-3 that PATANAPAIBOON did not like dealing with DAY. PATANAPAIBOON stated that he would rather pay CS-3 the extra money for each pill rather than dealing with DAY because DAY was unreliable.

### C.     Alexander M. DAY
### ██ N. 59th Street, Mesa, Arizona

78.     As discussed herein, Alexander M. DAY (a/k/a "Alex"), a white male born ██████, 1988, is a cocaine and methamphetamine trafficker who obtains these substances for further distribution to mid-level drug traffickers.  DAY resides at ██ N. 59th Street, Mesa, Arizona, which has been confirmed by investigation, surveillance, and review of utility records.  During the course of this investigation, case agents determined that DAY has used several cellular telephones, including ██████-1062 and ██████-0627, and also utilizes the Signal telephone application which is accessed through ██████-1062.  As of August 14, 2023, ██████-1062 is subscribed to by ██████.  Based upon the investigation to date, ██████ is believed to be the father of Alex DAY.

### i.     USPS Identified Suspicious Packages Associated with DAY

79.     Case agents reviewed reports related to an investigation conducted in 2022 by the United States Postal Inspection Service in conjunction with the North Central High Intensity Drug Trafficking Area (HIDTA) regarding DAY and OLSON.

A review of these reports reflects that in early 2022, the United States Postal Inspection Service had identified suspicious parcels that were sent to ██ N. 46th Street in the City of Milwaukee, an address associated with ████████. Case agents determined that ██ N. 46th Street, Milwaukee is ██████'s old address and then served as ████████, a rental location.

80.     The reports further stated that on Wednesday, January 26, 2022, the Minneapolis, Minnesota domicile contacted Milwaukee USPS.  The Minneapolis domicile notified Milwaukee USPS of an investigation related to an address in Duluth, Minnesota as well as Phoenix, Arizona. The USPS located a suspected drug parcel sent to ██ N. 46th Street, Milwaukee, Wisconsin, with an originating address in Scottsdale, Arizona. Internal USPS database searches revealed that ██ N. 46th St., Milwaukee, Wisconsin, had received numerous parcels sent from both Phoenix and Scottsdale, Arizona.

81.     USPS Inspectors removed the suspected parcel from the mail stream. USPS inspectors observed that the parcel, a USPS branded Priority Mail Express envelope, weighed approximately 6.55 ounces, bearing a handwritten label.  The sender's address was listed as ██ N. Scottsdale Road, Scottsdale, Arizona 85251, and addressed to "████████, ██ N. 46th St. Milwaukee, WI 53208."  The postage paid was $26.95.  Case agents know through bank account records, public websites for Detail Boys, and the investigation to date that ██ N. Scottsdale Road, Scottsdale, Arizona is the address for Detail Boys, a business owned by DAY.

82.     A Law Enforcement canine alerted on the parcel and USPS Inspectors obtained a federal search warrant to search the parcel. Located within the parcel were two vacuum sealed plastic bags with oval shaped, salmon-colored pills with "b974" and "30" stamped onto them.  The pills had a gross weight of 118 grams.  The TruNarc NarcotiCS-1 Analyzer identified the pills as methamphetamine, and the parcel was seized by USPS.

83.     On March 4, 2022, USPS identified three parcels that were mailed from two Texas addresses, one of which was intended for "███████████" at ███ N. 46th St., Milwaukee, Wisconsin, while two other parcels were intended for ███ W. Boden St., Milwaukee, Wisconsin. Based upon the investigation to date, USPS Inspectors removed one of the parcels from the mail stream and the post office retained the remaining two parcels.

84.     After removing the parcel from the mail stream, USPS Inspectors observed that the parcel was a white colored USPS branded Priority Mail Express box, weighing approximately 2lbs, 10 ounces or approximately 185 grams. Case agents' review of the affixed handwritten label revealed a return address of "███████ ██████ █ Pointsettia Pl., Brownsville TX 78520," and a listed recipient of "███████ ████████ at ██ W. Boden St., Milwaukee Wisconsin 53207.  The paid postage was $57.70.

85.     A law enforcement canine alerted to the parcel and Inspectors obtained a federal search warrant to open and search the parcel.  Inside the parcel, USPS located a vacuum sealed plastic bag with a pressed brick of a white powdery

substance, bearing a gross weight of 326 grams. The TruNarc Analyzer identified the substance as cocaine. The parcel was seized by the USPS.

86.    On March 5, 2022, ███████████████ was recorded on USPS CCTV at the Bayview Post Office, 1603 E. Oklahoma Ave., Milwaukee, Wisconsin, presenting his driver's license to a USPS employee who provided him with one of the three original parcels from the sending address in Texas. The third parcel was delivered to ████ N. 46th Street, Milwaukee, Wisconsin.

87.    On April 15, 2022, ███████████ was recorded on USPS CCTV at the Mid-City Post Office, 3421 W. Vliet St., Milwaukee, Wisconsin, picking up a parcel that had been shipped from the Phoenix, Arizona area. USPS Inspectors stated that the parcels' characteristics matched the methamphetamine parcel previously mailed to ████ N. 46th St., Milwaukee, Wisconsin that was sent from Scottsdale in January of 2022.

### ii.    CS-1's Cellular Telephone Information Confirmed that DAY and ARNOLD Obtained Kilograms of Cocaine in Brownsville, Texas

88.    Case agents reviewed, in part, the contents of CS-1's forensic cellular telephone extraction. Specifically, case agents reviewed Signal conversations between CS-1 and DAY, where DAY used the Signal phone application through ███████ 1062. The vast majority of the retrieved Signal communications were are drug related. The conversations, in part, related to the shipping of cocaine and Adderall pills to CS-1 at various residences in the Eastern District of Wisconsin. During the conversations, DAY acknowledges utilizing the United States Postal Service for years

and shipping "multiple packages." CS-1 and DAY further discussed utilizing drug proceeds to re-invest into additional drug purchases and selling to additional customers.

89. For example, on June 3, 2021, CS-1 asked DAY, "Why about the brick?" DAY then followed up with a photograph of what appears to be a large quantity of orange Adderall pills and unknown blue colored pills, along with knotted bags of a white powdery substance. Based upon my training and experience, the depicted white powdery substance is packaged in the same manner as the packaging of cocaine for resale.

90. As another example, on June 6, 2021, DAY sent a photograph of multiple kilograms of cocaine to CS-1. Some of the kilograms were wrapped in silver duct tape and at least four kilograms are vacuum sealed in clear bags. CS-1 responded to the photo, "What the fuck!!!!" and DAY replied, "lol," and "I think we just struck golf" (which case agents believe to be a typographical error and DAY likely meant "gold" instead of golf). On June 7, 2021, CS-1 asked, "So what the scoop with everything? What's the plan?" DAY replied, "We going to Brownsville Texas to buy a brick and then shoot it out." CS-1 asked, "Who's we? You know this cat?" DAY responded, "They do good business" and "Straight Mexican." DAY continued, "And I'm gonna head out there with my Boy Miles cause he wants some as well." CS-1 asked, "Oh hell yeah! What's he taxing?" and "He prob gets it pretty cheap being close to the border and all." DAY responded, "He gonna charge 29 this first run which is 11k cheaper then what we are at right now he said he will go as low as 23 after we are consistent and

do good business." CS-1 asked DAY if DAY was driving or flying and DAY replied, "Gonna just fly there and then package everything there and ship them out." CS-1 and DAY then discussed selling the kilogram of cocaine. They further agreed that if the quality of the cocaine was good then CS-1 and DAY could sell it to their customers for more money per ounce. Based upon their familiarity with the investigation, case agents believe that "Miles" referenced in the above conversation is Miles ARNOLD, as discussed below.

91.     CS-1 and DAY further discussed traveling to Brownsville, Texas and/or obtaining kilogram quantities of cocaine on July 20, 2021, October 5, 2021, February 1, 2022, February 22, 2022, March 29, 2022, April 18, 2022, April 26, 2022, and July 20, 2022, in addition to the dates discussed herein.

92.     Further, on March 24, 2022, CS-1 asked DAY, "How much are you grabbing total?" DAY responded a couple of messages later, "Jus the half I'm bringing my boy Miles who wants to get involved in the process so I'm gonna split half of one with him. He doesn't have enough to cover another 1 with me and those guys won't break a full one." CS-1 asked, "What's the word with the chunk that got shipped back? That still there? Did you already get rid of the brick you sent back to your house last time. You sent one here, and 1 to AZ." DAY replied, "The brick is gone we aren't gonna see that product that was sent back to TX." On March 25, 2022, DAY told CS-1, "I'll have miles send 1 yo your house and then I'll send 1 to your house and 1 to your office." Again, case agents believe that "Miles" referred to in this message chain is Miles ARNOLD.

93.     Additionally, on July 9, 2022, DAY sent CS-1 a screenshot of flight information that displayed a flight from Dallas/Fort Worth International Airport to Valley International Airport located in Harlingen, Texas, which is approximately 25 miles from Brownsville, Texas. The screenshot depicts flight 3201 on SkyWest airlines (operating as American Eagle) for Monday, July 11, 2022, showing passengers as "Alexander Day" and "Miles Arnold."  On July 11, 2022, CS-1 asked DAY to send out the Adderall before DAY left and DAY replied, "I can get them out, if not they'll go out tomorrow. Vanessa is still in town while I'm gone." Later in the conversation CS-1 asked, "So Vanessa is sending the adds out tomorrow then?" DAY responded, "I'll have her ship yours tomorrow." CS-1 replied, "Alright cool! You shipping the girl out Wednesday then." DAY responded, "Yessir." Based upon my training, experience, and familiarity with the investigation, I know that "adds" is short for Adderall and "girl" is commonly a code word used for cocaine.

94.     On July 12, 2022, DAY sent CS-1 this message, "My boy miles will be doing the shipping he's here with me." CS-1 asked, "Is miles packaging it or are you?" DAY replied, "We both are I already packages 1 key packaging another one now."

95.     At the beginning of March of 2023, case agents received a screen shot of text messages between DAY and CS-1, wherein CS-1 asked DAY for the status of the parcels sent to Pewaukee, Wisconsin, as well as additional parcels sent to Hartford, Wisconsin. Case agents know that DAY referred to the parcels seized by law enforcement on February 17, 2023. CS-1 informed DAY that the parcels never arrived at CS-1's residence and CS-1 did not know what happened to the parcels.

35

During the conversation DAY replied to CS-1, "IDK Vanessa sent them not me," presumably indicating that OLSON was the one who sent the parcels through the United States Postal Service that were intercepted by law enforcement.

96.     CS-1 provided information that DAY owns a mobile detailing business in Arizona, which CS-1 believes is named Detail Boys or something similar. CS-1 believes that DAY utilizes this business to launder DAY's drug proceeds.

### iii.     At the Direction of Case Agents, DAY Shipped Controlled Substances to CS-1

97.     In late March of 2023, case agents met with CS-1. Previously, CS-1 had informed case agents it was normal for CS-1 to communicate with DAY, on average, one to two times a month, to request controlled substances.   Usually, these communications involved a request from CS-1 for DAY to ship CS-1 a USPS package containing a "Zip" (i.e., according to CS-1, one ounce quantity) of cocaine, and up to 100 methamphetamine pills, which CS-1 referred to as "Addys" (short for Adderall). Case agents and CS-1 agreed that in order to remain consistent with shipments of USPS parcels to CS-1 from DAY, case agents instructed CS-1 to order cocaine and Adderall pills (methamphetamine) from DAY. Further, CS-1 informed case agents that CS-1 would not have to pay for either the cocaine or methamphetamine pills because DAY owed CS-1 money, and DAY had been repaying CS-1 for the previous debt owed by DAY (i.e., the $15,000 debt referred to above) by supplying cocaine and methamphetamine pills to CS-1 at no cost.

98.     From March of 2023 through late January 2024, case agents arranged controlled shipments of cocaine and methamphetamine from DAY utilizing CS-1. For

36

each of these controlled shipments, CS-1 contacted DAY through various platforms to arrange the transactions. In turn, DAY sent the requested substances to CS-1 through the United States Postal Service to various addresses located in the Eastern District of Wisconsin that CS-1 provided to DAY. Because DAY continued to owe a drug debt to CS-1, CS-1 did not exchange any money with DAY for the controlled substances sent to CS-1 by DAY. During this time frame, DAY facilitated the purchase of approximately 139.5 gross grams of cocaine and 441.5 gross grams of methamphetamine.

99. For each of the controlled shipments, the process was constant. CS-1 requested a quantity of controlled substances from DAY, which DAY would eventually agree to send to CS-1. Once DAY shipped the controlled substances through the United States Postal Service, DAY sent CS-1 a photograph of the USPS shipping receipt that depicted the USPS tracking number. Upon CS-1 receiving the tracking information from DAY, CS-1 contacted case agents, who then contacted USPS Inspectors and notified Inspectors of the parcel's tracking number. Case agents requested that Inspectors intercept the parcel once it arrived at the Milwaukee sorting facility.

100. Upon arrival at the Milwaukee sorting facility, USPS Inspectors contacted case agents when Inspectors had intercepted the parcel. Inspectors maintained possession of the parcel shipped by DAY until case agents met with USPS Inspectors to retrieve the parcels shipped to CS-1 by DAY. Upon meeting with case

37

agents, Inspectors turned over the parcel shipped by DAY and/or Chauncey HARVEY.

101.    After obtaining the parcel from Inspectors, case agents examined it. Case agents then photographed the parcel, as well as the parcel's label. Case agents opened the USPS parcel and inspected the contents. Case agents removed the controlled substances, which were then weighed and subjected to a field test. For each of the substances obtained by CS-1 from DAY, the field test was positive for each respective substance (cocaine and/or methamphetamine).

**Summary of Controlled Substances sent to CS-1 by DAY to Greater Milwaukee, Wisconsin**

| DATE | LISTED SENDER NAME AND ADDRESS | DEFENDANT | CONTROLLED SUBSTANCE | DRUG WEIGHT |
|---|---|---|---|---|
| March 30, 2023 | A███ M████ L██, ███ N. 45th Place, Phoenix, AZ 85032 | Alexander DAY | Cocaine 100 Methamphetamine Pills | 139.5 gross grams; 106.1 gross grams |
| May 30, 2023 | N██ R███, ███ N. 45th Pl, Phoenix, AZ 85032 | Alexander DAY | 80 Methamphetamine Pills | 77.9 gross grams |
| August 14, 2023 | A███ A███, ███ E. Mary Sharon Dr, Scottsdale, AZ 85266 | Alexander DAY | 100 Methamphetamine Pills | 77.9 gross grams |
| October 13, 2023 | B███ T███, ███ N. Civic Center Plz, Scottsdale, AZ 85251 | Alexander DAY/Chauncey HARVEY | 100 Methamphetamine Pills | 179.6 gross grams |

### a.  March 30, 2023, Controlled Shipping

102.  The initial text messages sent by CS-1 to DAY were typed and sent at the direction and in the presence of case agents. CS-1 asked DAY whether DAY had any "product available," and that CS-1 would like DAY to ship "some shit out Monday if possible." DAY responded, "I got you brother" and asked if CS-1 needed "adds" (which case agents know to be short for Adderall). CS-1 responded that CS-1 needed "Adds and girl." DAY did not immediately respond.

103.  Several days later, case agents again met with CS-1 in order to further discuss the transaction with DAY. Upon meeting with case agents, CS-1 sent a text message to DAY at cellular telephone number ███-1062 stating, "You check inventory?  You'd be the man if I could get 2 zips and 100 adds sent out tomorrow. Peeps are bugging me." Based upon their training, experience, and familiarity with the investigation, case agents know this to be in reference to a two-ounce quantity of cocaine and 100 "Adderall" pills.  This text message was followed by an additional text message CS-1 sent to DAY stating, "Think you can make that happen for me daddy?" DAY replied, "I can make that happen for you pal." During the same text message thread, CS-1 asked DAY to send the cocaine and methamphetamine pills to a specific address in Milwaukee, Wisconsin, and also requested that DAY supply CS-1 with the USPS tracking number associated with the parcel so that CS-1 could track the package.

104.  CS-1 again did not receive an immediate response from DAY, which CS-1 stated was not unusual. CS-1 had previously informed case agents that DAY was

"unreliable." Text messages would often go unreturned, or DAY would not send the requested product in a timely manner despite DAY telling CS-1 to the contrary. The next day, CS-1 sent a text message to DAY stating, "Rise and shine! You going to be able to get that out today? Have some buddies leaving later this week and are relying on it." CS-1 and DAY sent a few text messages back and forth throughout the day, and DAY eventually sent a text message to CS-1 stating, "I got you bro."

105.   The following day, CS-1 sent another text message to DAY stating, "You sending that stuff out soon?" DAY replied, "Yessir." CS-1 and DAY exchanged several more text messages, and later in the day DAY sent CS-1 a picture of a USPS shipping receipt. A review of the USPS shipping receipt revealed that on March 29, 2023, DAY sent two "Express 1-day" packages through USPS. One package was destined for California, while the other was destined for Milwaukee, Wisconsin. The shipping cost for each package was $28.75, and the tracking number was visible on the receipt. According to the USPS receipt, the scheduled delivery date was Thursday, March 30, 2023, and the package was sent from the "Mesa Desert" USPS location at 6644 E. Broadway Road, Mesa, Arizona.

106.   On May 3, 2023, case agents met with USPS Inspectors. Inspectors provided case agents with a USPS surveillance video obtained from the USPS location in Mesa, Arizona, dated March 29, 2023. Case agents reviewed this video, and observed that at approximately 2:48 p.m., DAY entered the lobby of the post office. Case agents observed DAY with two parcels and what appeared to be a cellular telephone. DAY approached the counter at approximately 2:56 p.m. and case agents

observed DAY hand the parcels to the postal worker. DAY exited the post office at approximately 3:02 p.m. Case agents identified Alexander DAY through a comparison of his driver's license photographs obtained from both the Wisconsin Department of Motor Vehicles and the Arizona Department of Transportation, as well as from comparisons to DAY's publicly accessible social media accounts.

107. This package was subsequently seized by case agents as described above and contained approximately 139.5 gross grams of cocaine and 106.1 gross grams of methamphetamine pills.

### b. May 30, 2023, Controlled Shipping

108. Throughout late April and May of 2023, case agents met with CS-1 to discuss the shipment of additional controlled substances from DAY to CS-1. Beginning around April 25, 2023, CS-1 asked DAY to send CS-1 two to three "zips," referencing two to three ounces of cocaine. DAY responded through a series of text messages that DAY would send CS-1 cocaine and "Addys" (methamphetamine pills).

109. On May 15, 2023, CS-1 sent a text message to DAY stating, "You able to get me some girl and adds?" CS-1 requested that the package be shipped by DAY for arrival in Milwaukee on Friday. DAY responded, "I think I can make that happen pal!" Based upon their training, experience, and familiarity with the investigation, case agents are aware that "some girl and adds" refers to DAY sending CS-1 a quantity of cocaine and "Adderall" pills.

41

110. Later in the same conversation, DAY sent a text message to CS-1 that stated, "I bought a crazy security system and made my house all smart. I'm learning to lock up and secure the assets as much as I can. Just never know." Based upon their training, experience, and familiarity with the investigation, case agents believe that during the time of this conversation, DAY was residing with OLSON at 938 N. 59th Street, Mesa, Arizona. Case agents further believe that DAY installed a security system at ██ N. 59th Street, Mesa, Arizona in order to protect DAY's drug's proceeds ("I'm learning to lock up and secure the assets as much as I can").

111. On May 16, 2023, CS-1 sent DAY a text message that stated, "Hey bud sent me 3 zips and 100 adds. You able to make that happen Friday for me bud? I'd really appreciate it." Later that night, DAY responded, "Sorry pal yes I can make that happen." On May 18, 2023, CS-1 sent DAY a text message that stated, "Ola amigo." DAY responded, "Hey brother we will be good. Hit short on giro" which was followed up by "Girl" and another message "What's addys."

112. A series of text messages followed regarding DAY sending CS-1 cocaine and "Adderall." During the course of these messages, DAY sent CS-1 a text message on May 19, 2023, that stated, "You will have yayo tomorrow, but k adds till Monday" along with other messages. CS-1 asked, "If you're gone who's sending it?" DAY responded, "Sending them from TX, grabbing more of them. Reason I can't send the addys to you. Nah, I'll send the myself. 530pm is. Is cut off time I'll have plenty of time. In case you were wondering I have inventory ready, in town product but I clearly couldn't get that out in time." Another message followed stating, "Sending 3

42

out today." Based upon their training, experience, and familiarity with the investigation, case agents believe that DAY was in Texas when DAY sent these text messages to CS-1 and would send CS-1 cocaine ("You will have yayo tomorrow") but that CS-1 would have to wait for the Adderall pills until DAY returned to Arizona ("but k adds till Monday").

113.    Subsequently, between May 19 and May 22, 2023, another series of text messages occurred between DAY and CS-1. On May 22, 2023, DAY sent CS-1 a text stating, "You want good or new bad first pal." CS-1 stated, "Surprise me haha." DAY replied, "Good news addys will be there Wednesday. 100 as you asked." Another message followed stating, "Unless you want more." CS-1 responded, "100 is fine, only have a couple peeps that need a few." CS-1 asked, "What about the girl?" DAY responded, "Signal wtf are we doing" followed by "Clear these chats." Based upon their training, experience, and familiarity with the investigation, case agents believe that DAY became nervous for unknown reasons when CS-1 brought up cocaine ("What about the girl?") and wanted CS-1 to further discuss the cocaine transaction on the encrypted Signal telephone application instead of over text message ("Signal wtf are we doing" followed by "Clear these chats").

114.    CS-1 then moved the conversation to the Signal telephone application, which DAY accessed through ███████-1062. DAY sent CS-1 a message stating, "End of week hoping for the girl but not from TX unfortunately. I'm on the river right now you gonna have a 10 minute window to hop on the phone with me." CS-1 responded that CS-1 would call DAY later.

43

115.    From May 22 through May 25, 2023, CS-1 and DAY messaged back and forth on the Signal telephone application regarding DAY sending CS-1's requested "Adderall" pills. Numerous messages were sent regarding the logistics of the package's mailing.

116.    On May 25, 2023, DAY sent a photograph of a manilla envelope to CS-1 with the message, "Hefe to post office now" and "My apologies, tough business day yesterday." Based upon their training, experience, and familiarity with the investigation, case agents believe that DAY did not ship the "Adderall" pills to CS-1 in a timely manner, but that DAY was heading to the post office to ship the pills to CS-1 ("Hefe to post office now" and "My apologies, tough business day yesterday").

117.    On May 27, 2023, CS-1 received a photograph from DAY depicting a post office receipt displaying the tracking number of a package sent to CS-1, which was due to arrive on May 30, 2023, to an address in Milwaukee.  This package was subsequently seized on May 30, 2023  by case agents as described above. Case agents recovered approximately 77.9 gross grams of methamphetamine pills from this package.

### c.    August 14, 2023, Controlled Shipping

118.    Throughout August of 2023, case agents met with CS-1 regarding the procurement of additional quantities of cocaine and methamphetamine pills from Alex DAY.

119.    On August 4, 2023, CS-1 sent a text message to DAY stating that DAY had been "dicking" CS-1 around regarding sending the requested quantities of cocaine

44

and Adderall pills to CS-1. CS-1 told DAY that DAY had CS-1's "cash" and couldn't even send CS-1 the requested quantities as agreed upon.

120.    Later that day, DAY responded to CS-1 that DAY would call CS-1 soon. Case agents had been advised by CS-1 that DAY was in the Milwaukee area during these conversations and that DAY had advised CS-1 that DAY would meet up with CS-1 to provide CS-1 with the requested cocaine and Adderall pills. On that occasion, DAY neither called nor met with CS-1 while DAY was in the Milwaukee area.

121.    On August 7, 2023, CS-1 sent screenshots of a conversation between CS-1 and DAY to case agents. Case agents reviewed the conversation and observed that during this conversation, DAY told CS-1, "I'm sending you addys" followed by "How many." CS-1 responded, "Can you do 150-200? You have any girl?" Later that evening, DAY answered, "I can go that for the adds." CS-1 stated, "Alright cool. You know gene you'll have girl next?" DAY responded that DAY would "get some to you this week." Later in the conversation, CS-1 asked when DAY would be able to "get those adds out" and DAY responded "Tomorrow." CS-1 instructed DAY to send the package to an address in Milwaukee, Wisconsin and to provide CS-1 with the tracking information for the package.

122.    On August 10, 2023, CS-1 sent case agents an additional screenshot of a conversation with DAY. During this conversation, DAY stated, "I told you bro she moved out, needed 30 days, staying at a friend's house. My family and here are both in town I'm headed there."  CS-1 informed case agents that this conversation was in reference to OLSON and DAY breaking off their relationship and OLSON moving out

45

of DAY's residence in Arizona. Based upon the investigation to date, case agents believe that OLSON and DAY did in fact break off their relationship sometime around this time frame, and OLSON moved out of the residence at █ N. 59th Street, Mesa, Arizona. At the time, case agents did not know exactly where OLSON moved, but it was case agents' belief that OLSON had remained in the Phoenix, Arizona area.

123.    On August 10, 2023, at 7:55 p.m., CS-1 sent case agents a screenshot of a United States Postal Service receipt showing the tracking number for a package sent to Milwaukee, Wisconsin, displaying a scheduled delivery date of August 11, 2023. This package was subsequently seized on August 14, 2023, by case agents as described above. An examination of the package's contents revealed that it contained approximately 77.9 gross grams of methamphetamine pills.

### d.    October 13, 2023, Controlled Shipping

124.    On October 13, 2023, DAY sent CS-1 a message that stated, "You gonna be good today." CS-1 asked, "Who's sending them out? I'm going to need tracking number." DAY responded, "Chauncey, I do a lot of business with him. He's good for it when he does business I'll send tracking." CS-1 replied, "Alright cool! Can he just send me the tracking personally when he's at the post office? Need to make sure I have that and we all know how you are haha." DAY responded, "Yessir it'll be on signal."

125.    Further specifics of this controlled purchase are detailed below. This package was subsequently seized by case agents as previously described. The package contained 179.6 gross grams of methamphetamine pills.

126.    Between September 5, 2023, and October 13, 2023, CS-1 had numerous communications with Alex DAY, Vanessa OLSON, and Chauncey HARVEY through different platforms to include text messages, the Signal telephone application, WhatsApp, as well as Instagram.

127.    On September 12, 2023, DAY informed CS-1 that the cocaine would now cost CS-1 "$1000 per u it after we got robbed in Texas." CS-1 questioned why CS-1 would have to pay at all given the outstanding debt, and DAY informed CS-1 "we lost our connect with that cheap pricing" which case agents believe to be in reference to the Brownsville, Texas source of supply.

128.    Throughout the next days, communications continued between DAY and CS-1 regarding DAY sending CS-1 the requested quantities of cocaine. DAY told CS-1 that DAY would send the cocaine but then never sent it. At one point, DAY told CS-1 to "Delete this thread." DAY followed up with, "Signal papi. Signal."

129.    On September 22, 2023, DAY sent CS-1 a message on Signal that stated "How about I get a half bird for you and call it even!!! Shits not working like it used too." Case agents believe that DAY attempted to settle the ongoing debt with CS-1 by offering a half-kilogram quantity of cocaine to CS-1 ("How about I get a half bird for you and call it even!!!).

130.    CS-1 later sent a message to DAY informing DAY that CS-1 wanted to take the "half brick" DAY had offered and "call it even." CS-1 told DAY that CS-1 and DAY were probably "sick" of each other. CS-1 stated, "So send me the half brick like you said or just send my money back. Then any adds or other stuff I order from you

47

moving forward, I'll pay going rate. What are your thoughts?" DAY never sent this quantity of cocaine to CS-1.

131.    On or around September 28, 2023, CS-1 asked DAY, "Hey chief, did you not have any of the fake ones left?" DAY responded, "I got some, how many you looking for." CS-1 responded, "Idk 100-150? 150 if you can." DAY later replied, "Yeah I can make that happen for you."

132.    On October 5, 2023, DAY told CS-1 that DAY was "grabbing 100 today" for CS-1 and if CS-1 needed more, "Vanessa can get you." Case agents believe "Vanessa" to be OLSON.

133.    Also on October 5, 2023, DAY told CS-1 in an audio recorded text message sent by DAY to CS-1, that DAY would send a photo of the 100 pills to CS-1 to show that DAY had them and that DAY was heading over to "C's house to grab em, so he has em, in hand took a picture when I got em." DAY further related to CS-1 that if CS-1 needed more than the 100 for the next 30 days to "hit up Vanessa and she'll take care of em, umm, she'd be able to grab them for you as well too." CS-1 informed DAY that the 100 was fine for now. DAY further related to CS-1 that DAY was "grabbing them now I'll send pics they quality fakes lol." Based upon their experience, training and familiarity with the investigation, case agents believe that DAY referred to receiving the Adderall pills from Chauncey HARVEY, and that DAY was traveling to HARVEY's residence to obtain the requested quantity of pills. (heading over to "C's house to grab em, so he has em"). Case agents further believe

48

that DAY referenced OLSON when DAY told CS-1 to "hit up Vanessa and she'll take care of em, umm, she'd be able to grab them for you as well too."

134.  On October 12, 2023, DAY sent CS-1 a message via DAY's Instagram account and told CS-1 that DAY was "Gonna just grab em and give them to her, she will confirm with you." CS-1 replied, "Alright, if it's easier, send me Vanessa's number and I can coordinate with her. I'm assuming she's the one sending?" DAY responded, "Yeah she has a couple clients she sends same inventory too as well so she knows what she is doing. She talks on signal only about shit" and followed up this message with "███-0755," which case agents know based on this investigation to be OLSON's number. CS-1 then messaged OLSON via the Signal application on ███-0755 and told OLSON that DAY was "supposed to pick up some addy this morning and you'd be sending them out today. Are you planning on doing that? He was supposed to send me 150 of them 3-4 weeks again." OLSON responded, "Alex asked if I could but I won't be around till Monday."

**iv.  DAY Engaged in Drug Related Conversations with CS-1**

135.  On November 16, 2023, CS-1 placed a recorded telephone call to Alexander DAY at the direction of case agents.

136.  During this call, CS-1 asked DAY if DAY was alright. CS-1 told DAY that CS-1 had not seen DAY "off your game" like this before. DAY told CS-1 that a lot of "bad things" have happened to DAY recently. DAY talked about DAY's problems with the Detail Boys business, as well as DAY's relationship issues with OLSON. CS-1 then explained how DAY had "ghosted" CS-1. DAY responded that CS-1 wasn't the

49

only one whom DAY had "ghosted" and apologized to CS-1. DAY stated that DAY was nervous because "I got Chauncey out here" (HARVEY) who was "under investigation by detectives" who had come to HARVEY's house in Arizona. DAY told CS-1, "He's really my only source of ahhh, shit out here, it's where I get all of my everything, all of my inventory comes from dude so kinda spooked about that situation but now he's running things out of old town, so I mean, I.." CS-1 asked, "He knows for a fact he's getting investigated?" DAY replied, "So he has a separate house, he has like a, ummm, I forgot what they call it, but basically it's like a little house in the back of his house and there was this kid named Forest fucking lived there and I guess umm, Forest's baby mama got a call from the detective asking about Chauncey HARVEY, and he's going through a court case for his kids and so Chauncey's name got fucking brought up when the detectives stopped at the house to talk to Forest, and he was like dude, I'm freaking the fuck out now so I guess the detective was asking about drugs or related shit." Based upon their training, experience and familiarity with the investigation, case agents believe that DAY had not been communicating with CS-1 because DAY and HARVEY were nervous about the police contact at HARVEY's residence ("I got Chauncey out here" and was "under investigation by detectives"). Further, DAY identified his source of supply to CS-1 as HARVEY ("He's really my only source of ahhh, shit out here, it's where I get all of my everything, all of my inventory comes from dude" and "like that's my only source dude, like for the Addy's, for the girl, for everything dude").

137.    CS-1 asked DAY if Forest said anything to the police, and DAY replied, "No he didn't say anything but I think he's more so that he is, that people are snooping around. I guess a couple of his clients that came to his house, he lives on a corner lot, there's like a church and a big ass like tennis courts and shit across the way, I guess people were leaving his house and they were getting busted like leaving his house, like not right out front but they'd go down a couple blocks."

138.    CS-1 then discussed settling DAY's debt with CS-1 moving forward. CS-1 asked DAY how DAY wanted to "move forward with that." In sum, based on the investigation to date, and this communication, case agents believe that DAY did not want to take the financial loss of sending controlled substances to CS-1 without payment.  Put another way, DAY's transactions with CS-1, did not financially benefit DAY until the on-going debt was satisfied.

139.    CS-1 told DAY that whatever was easier for DAY and CS-1 didn't care if DAY had "to do it in increments or whatever." CS-1 told DAY that CS-1 understood that DAY was "going through some shit" and didn't expect DAY to "pay it right away." However, CS-1 didn't want a situation to develop where it took DAY "how many months or a year to fucking give me my money back."

140.    The conversation continued and DAY stated, "I can probably get both [Adderall and cocaine] to you. I mean I guess dude, me and Chauncey have been sitting down and kinda figuring out what we're gonna do cause, I'm basically going to be helping him out with his clients and shit. His business is out of like ahh, one of the offices that are, be optimal dude, cause I got a kilo today so I'm gonna kinda do

51

that together and he's gonna give me a little cut, we're not doing anything crazy but, I mean dude, we're getting inventory and keeping it at this little stash house and shit. So umm, as far as inventory, the oranges are going to be the easiest to get, the girls gonna be a little harder. It's just it comes when it comes, and then when it's gone." CS-1 cut off DAY and stated, "I would prefer the girl more than the Adds." CS-1 told DAY, "The girl, at least I can dish off easier and at least re-coup my funds." Based upon their training, experience and familiarity with the investigation, case agents believe that DAY told CS-1 the Adderall pills would be easiest to obtain ("the oranges are going to be the easiest to get") and the cocaine would be harder for DAY to obtain for CS-1 ("the girls gonna be a little harder"). Further, case agents believe that DAY and HARVEY are selling cocaine together in Arizona ("I got a kilo today so I'm gonna kinda do that together and he's gonna give me a little cut").

141. CS-1 then asked about "Vanessa" (OLSON) and DAY discussed OLSON and DAY's relationship. During the conversation regarding OLSON, DAY stated that OLSON was living in a "rinky dink tiny place that she stays at" with two friends. DAY stated that he sees OLSON four to five days a week, but OLSON was still living at a different house. DAY stated that DAY was selling his house and was going to buy something different in a different location.

142. On December 12, 2023, at 10:18 p.m., CS-1 recorded a telephone call with DAY.

143. During this call, DAY asked CS-1 if CS-1 had any contact with CS-3. CS-1 told DAY that CS-1 hadn't talked to CS-3 in "a while." DAY stated, "He was out

52

here bro, talkin 'bout some shit." CS-1 responded, "Like what?" DAY replied, "I dunno bro, he said you was hot." CS-1 responded, "Why would I be hot? DAY answered, "I dunno. Just so you understand…this is not…I didn't talk to him directly; I just heard it from another source that…he fuckin thinks that you ratted him out." Based upon their training, experience, and familiarity with the investigation case agents believe that DAY asked CS-1 if CS-1 was cooperating with law enforcement ("I dunno bro, he said you was hot").

144. DAY then explained that CS-3 told DAY that CS-3 "got busted;" that CS-3 thinks that CS-1 is a law enforcement informant, and therefore CS-1 would have caused CS-3's "bust" (i.e., arrest). DAY informed CS-1 that DAY was relaying this information as a courtesy. DAY also mentioned that DAY would be in the Milwaukee area from December 23, 2023, through December 28, 2023, and suggested that they could meet up during that time.

145. On December 14, 2023, at 2:14 p.m., CS-1 recorded a telephone call to DAY.

146. CS-1 brought up the December 12, 2023, conversation between CS-1 and DAY, noted above. CS-1 asked DAY, "Did you figure anything out as far as what you are able to get so we can square up?" DAY replied that he had not. CS-1 stated, "Cause I was thinking, is there any way you can do like a nine piece and then maybe like 200 Adderall and then we'll just call it even, cause that would come out to probably like 12, and then I'll just, kinda like help you out a little bit and then…." DAY replied "yeah, (unintelligible) I could probably do that bro" and then

53

"I can definitely get the Addy's, that's not hard at all dude (unintelligible). I'll have those for sure. Let me just figure out what I can get on the numbers and the amount, ah, right away. I'm going to pick out like one half dude (unintelligible). It shouldn't be that hard, it's not that much more so it shouldn't be an issue dude." CS-1 responded, "Okay." Case agents are aware that CS-1 suggested a nine-ounce quantity of cocaine along with 200 Adderall pills to settle the debt for approximately $12,000 worth of controlled substances. ("Is there any way you can do like a nine piece and then maybe like 200 Adderall and then we'll just call it even, cause that would come out to probably like 12").

147.    CS-1 told DAY after that, CS-1 and DAY would be "squared away" and then if CS-1 needed any future controlled substances, CS-1 would pay DAY using "Zelle or whatever." CS-1 told DAY that they would figure it out, and then CS-1 would pay DAY "just like a normal client." DAY replied, "Yeah, that sounds good. I'll take care of it from there. I would probably want to do a little, probably want to be shooting over maybe more than one at a time just so we don't have to do so many."

148.    DAY continued, "Yeah bro, it's making me nervous with what fucking (CS-3) is saying, they got photos of all you mother fuckers. I'm like damn, bro, it doesn't, it doesn't, I can't not imagine that. I'm sure they do, but like dude, we're not doing anything crazy, so I don't really think they're fucking going to put their time and effort into something like that you know." CS-1 agreed. Based upon their training, experience, and the investigation to date, case agents believe that DAY was nervous about a pending investigation because CS-3 told DAY that law enforcement

54

agents had shown photographs of various individuals related to the DAY DTO to CS-3. However, DAY didn't believe that DAY or CS-1 would be a target of a law enforcement investigation ("It's making me nervous with what fucking (CS-3) is saying they got photos of all you mother fuckers").

149.     DAY related, "I don't know why he would lie about it. It's a weird thing to lie about but you know…" CS-1 agreed. CS-1 stated, "That's fucking, Milwaukee fucking bullshit drama." DAY replied, "It is. And it's a small-town bro, everyone knows who's selling shit in that town. I mean, or at least when we were fucking in the scene and shit you know, everyone knows what everyone's doing dude so…" CS-1 again agreed. DAY stated, "It's really hard to get caught up, dude, keep it 100 bro, they aren't really going after a lot of white kids." CS-1 responded, "Fuck no" and "there's no point for them to really even waste their time." DAY continued, "Naw, I mean it's the most segregated fucking city in all the fucking town dude. I can't imagine that they are going for white dudes and shit, that's just how it is." DAY stated, "But that's what it is man, that's how it is. People hate to hear that shit, but it's like bro, you know what it is too bro, that's what it is man, sucks to hear but you know, it's that race thing dude." CS-1 responded, "It's just unfortunate that's the way the world is." Based upon their training, experience, and familiarity with the investigation, case agents believe that DAY told CS-1 that law enforcement would not investigate "white dudes" because of the rate of violence occurring in the City of Milwaukee.

55

150.  On December 26, 2023, CS-1 contacted case agents and stated that CS-1 had arranged to meet with DAY around 6:30 p.m. that evening.

151.  At approximately 6:15 p.m., case agents met with CS-1 at a predetermined location, where case agents supplied CS-1 with covert audio recording equipment. Once the equipment was activated by case agents, CS-1 proceeded to the pre-determined meet location that CS-1 and DAY had agreed upon. Case agents remained nearby to monitor the audio recording equipment.

152.  DAY arrived at the meeting location. During the conversation, DAY discussed how DAY had previously purchased a residence in Mesa, Arizona, which was currently on the market for $600,000.  Based upon the investigation to date, this information is consistent with other information obtained by case agents; that DAY currently resides at address █ N. 59th St., Mesa, Arizona.  Case agents subsequently located a Zillow real estate listing for █ N. 59th St., Mesa, Arizona, showing that it is currently listed for $595,000.

153.  During the conversation, DAY told CS-1 that DAY now has access to ecstasy pills, which DAY was selling for $20 a pill.  DAY stated that DAY could likely reduce the price of the ecstasy to $16 apiece.  DAY informed CS-1 that DAY was able to regularly obtain up 1,000 ecstasy pills which DAY was able to obtain in "jars" of 100 pills. DAY inquired whether CS-1 would be interested in buying any pills.  CS-1 told DAY that the CS-1 would purchase quantities of ecstasy from DAY and that in return, DAY would deduct the cost of the ecstasy from the debt owed to CS-1. CS-1 again told DAY that once DAY returned all of the $15,000 owed to CS-1, whether in

cash or by means of $15,000 worth of controlled substances, DAY could consider DAY's debt with CS-1 satisfied.

### D.　　Miles T. ARNOLD
██████ N. 45th Place, Phoenix, Arizona

154.　As discussed herein, Miles T. ARNOLD (a/k/a "Miles"), a white male born ██████, 1987, is a cocaine trafficker who obtains this substance with DAY for further distribution to mid-level drug traffickers.  ARNOLD resides at ██████ N. 45th Place, Phoenix, Arizona, which has been confirmed by investigation, surveillance, and review of utility records. During the course of this investigation, case agents determined that ARNOLD uses cellular telephone ██████-2382 subscribed to by ████████.  Based upon the investigation to date, ████ ████████ is believed to be the father of Miles ARNOLD.

155.　Since at least December of 2020, ARNOLD has been responsible for distributing large quantities of cocaine along with DAY throughout Milwaukee, Wisconsin.  Based upon the investigation to date, it is also believed that DAY and ARNOLD no longer have as close a relationship as they did in the past.

156.　As detailed below, case agents know that around May 2023 ARNOLD and DAY had a disagreement over money.

57

### i.     DAY Identifies Miles ARNOLD as DAY's Drug Trafficking Partner

157.    On May 24, 2023, at approximately 4:45 p.m., CS-1 called DAY using the Signal telephone application, which is utilized through DAY's cellular telephone number ██████-1062. DAY did not answer this call. CS-1 then called DAY again at approximately 4:46 p.m., and CS-1 was able to record the telephone call.

158.    During this call utilizing the Signal telephone application, DAY stated that he had been "running carts" (making reference to marijuana vape cartridges) with DAY's "Texas people." DAY related to CS-1 that approximately one month ago, DAY learned "Their shit got caught up in Mexico, blah, blah, blah, fucking some guys are gonna pay for this shit, dude, they fucking basically like gave carts to the wrong person, didn't get paid, so I'm like ok bro, listen."  CS-1 asked DAY if DAY was receiving from or selling carts to them. DAY responded that DAY was selling carts to them, and that DAY was buying carts in "LA" and bringing the carts to "them" in Texas.  DAY further stated that DAY had a "side partner" named "Miles" whom DAY thought CS-1 did not know.  DAY related that "Miles" buys "His own inventory as well, and I connected him with the Mexicans and shit right, these fucking guys."  CS-1 asked if "Miles" was the guy who would sometimes travel to Texas with DAY, and DAY stated that it was, and that "Miles" was "flamboyant."

159.    Based upon an examination of databases and subpoenaed records, case agents believe "Miles" to be Miles ARNOLD, W/M, DOB: XX/XX/1987. Based upon their training, experience and familiarity with the investigation, case agents further believe that during this portion of the conversation, DAY informed CS-1 that DAY

sells marijuana vape cartridges obtained from Los Angeles, California to the Brownsville, Texas cocaine suppliers in exchange for discounted cocaine. Case agents further believe that Miles ARNOLD is a drug distribution partner with DAY ("DAY had a "side partner" named "Miles"). Case agents also believe that DAY introduced ARNOLD to the Mexican cocaine suppliers ("I connected him with the Mexicans and shit") and that ARNOLD had traveled to Brownsville, Texas with DAY in the past.

160.   CS-1 told DAY that CS-1 had never met "Miles" but had heard DAY previously talk about "Miles." DAY stated, "He's my boy bro, and fucking, like, kid's got bread. Fucking does well for himself, fucking you know, he's in the game. So anyways long story short, he started coming in with me and shit cause we were getting shit for a little bit cheaper. We were buying multiple units and shit like that you know, that's why I was getting 'em for the price I was getting 'em for, and them um, so he was actually handling some of the business for me. So, he'd go to LA, he'd pick up the LA product, he'd go to fucking Brownsville, and then we would switch off or whatever. Well, this last time, dude, I was just fucking you know, I was not doing. I didn't go to Brownsville. I had some shit to handle out of that jet deal, so I had to stay back. He went to LA, got the carts, went down to fucking Brownsville. I was still dealing with the jet deal. The whole deal was for him to sit down there and fucking camp down there, let the guys sell the fucking carts, out of the hotel basically, right? And then get them off, and then he would get the full unit, units, the two units." CS-1 responded, "Yep."

161.    DAY continued and stated that the "dude" wanted to go to "EDC" (believed by case agents to be a music festival in Las Vegas).  Because ARNOLD wanted to go to "EDC," the Texas people "Took all the product, which was like 1,000, no 1,200 carts, 500 fucking pre-rolls. He was supposed to sell them all, get all the cash, give to them, and then fucking basically have credit towards the units. He fucking gave 'em all the shit bro.  These motherfuckers are now telling me that they got raided. Oh, we got raided. They call him Colorado, oh, Colorado got raided bro." Based upon their training, experience and familiarity with the investigation, case agents believe that ARNOLD and DAY became partners in the cocaine distribution business in order to obtain kilogram quantities of cocaine for less money ("he started coming in with me and shit cause we were getting shit for a little bit cheaper, we were buying multiple units and shit like that you know, that's why I was getting 'em for the price I was getting 'em for").

162.    Case agents further believe that DAY travels to Brownsville to obtain kilogram quantities of cocaine.  In this regard, case agents have viewed photographs of cocaine kilograms contained in CS-1's phone extraction. Case agents are further aware from the review of the CS-1's telephone extraction that CS-1 and DAY refer to kilograms of cocaine as "units."  Additionally, case agents believe that ARNOLD traveled to Brownsville, Texas at the direction of DAY to obtain one or two kilograms of cocaine ("then he would get the full unit, units, the two units"). Case agents further believe that the Texas cocaine suppliers took all of ARNOLD and DAY's marijuana vape cartridges and pre-rolled marijuana products without either paying ARNOLD

60

or getting credit toward the kilograms of cocaine ("took all the product" and "basically have credit towards the units").

163. CS-1 told DAY that CS-1 thought "they just jacked it," and DAY responded, "And fucking Miles is like you bitch ass, and I was like, bro, listen, you fucking left, you left fucking Texas with no money and no product motherfucker, and you thought that they were going to fucking send us money? And our inventory out, are you fucking kidding me, bro, like how the fuck, how dare you bro." DAY told CS-1 "he's actually a smart kid" but "long story short, that happened, and just so you know when I was like I'll send you out the units and shit, no problem, dude that didn't happen because that's what happened." CS-1 told DAY that made sense to CS-1. CS-1 further told DAY that DAY was smarter than that, and that DAY had put too much trust and DAY interrupted, stating, "I mean I only have so much fucking time on me so when I gotta partner and shit, like I'm getting better deals and shit, and he's doing some of the legwork, like it worked bro, it was working. You know it worked, and like dude if the kid, if he needed 10 grand I'd give it to him; if I need fucking 20 grand he'd give it to me. Like it didn't matter, it's kinda like me and you, you fucking gave me 15 g's." Based upon their training, experience, and familiarity with the investigation, case agents believe that DAY was upset with ARNOLD for losing the money and not obtaining the kilograms of cocaine ("you left fucking Texas with no money and no product"). Case agents further believe that DAY explained to CS-1 why DAY had not sent CS-1 the requested quantities of cocaine recently ("just so you know when I was

61

like I'll send you out the units and shit, no problem, dude that didn't happen because that's what happened").

164.   DAY stated to CS-1 that DAY was at a "crossroad." DAY needed to figure out a way to recoup their money. DAY stated, "He's talking to me, he's talking to me right now. I'm like bro, I know you just fucking tried to jack my shit bro. Don't give me no bullshit. Like I want fucking money right now bro, like, and it's like do I go the route of being like, hey, I'm a Caucasian, like listen bro, I got my own fucking plugs; you might be cartel but I got my own plugs. Do I put it out there or do I say fuck it and chalk up the loss and say fuck it you know?"  CS-1 told DAY that CS-1 didn't know the guys that DAY was dealing with, but they were probably more connected and had more pull than DAY so CS-1 told DAY not to put himself in harm's way. DAY agreed with CS-1. Based upon their training, experience, and familiarity with the investigation, case agents believe DAY informed CS-1 that DAY remained in contact with the Mexican Cartel cocaine suppliers in Texas ("he's talking to me right now, I'm like bro, I know you just fucking tried to jack my shit bro" and "you might be cartel, but I got my own plugs"). Further, case agents believe that DAY asked the supplier for DAY's money back ("like I want fucking money right now bro").

165.   DAY told CS-1 that it was "a little bit of an L," but DAY continues to make money on "the girl." CS-1 told DAY that if those guys wanted to keep doing business with DAY that they would "come straight."  DAY agreed and said that was what DAY thought the last time and "why would I bring any of our business down to them, you know?"  DAY continued, "But the thing is I just wanna be like, bro, that's

62

fine, like you know shit happened but like then figure out a way to like credit me for the next units you know? I wanna wait for the next units that's it." CS-1 told DAY that was a conversation that DAY would have to have with them. CS-1 again told DAY to be careful and not to do anything that would "get yourself killed." DAY stated, "I'm not trying to do that shit either, bro." DAY indicated that DAY was going to try and work out the problem.

166. Based upon their training, experience and familiarity with the investigation, case agents believe that DAY told CS-1 that DAY lost money ("a little bit of an L") but was still making money selling cocaine ("the girl"). Case agents further believe that DAY would like to continue to conduct cocaine transactions with the Mexican suppliers in Texas if the suppliers agreed to credit DAY's money towards the purchase of the next kilogram(s) ("shit happened but like then figure out a way to like credit me for the next units you know? I wanna wait for the next units that's it").

167. CS-1 told DAY "the ads is good" and that CS-1 had been busy. CS-1 and DAY then engaged in general conversation after which time CS-1 asked DAY, "So you didn't send the Ads out yet?" DAY replied, "I'm going to send them out today. They'll be there tomorrow, and I'll be working on the other part of the order." CS-1 told DAY to send the tracking information and CS-1 would be "good to go." Case agents are aware that at their direction, CS-1 had attempted to order "Adderall" pills and one to two ounces of cocaine from DAY. Case agents believe DAY informed CS-1 that DAY would be sending the Adderall pills to CS-1, but that DAY was still trying to obtain

63

the cocaine requested by CS-1. ("I'm going to send them out today. They'll be there tomorrow, and I'll be working on the other part of the order").

168. On June 26 and 27, 2023, CS-1 forwarded case agents text messages that were sent between CS-1 and DAY. DAY previously told CS-1 that DAY experienced issues with DAY's source of supply in (or near) the area of Brownsville, Texas. During the conversation CS-1 asked DAY, "You ever straighten up everything with your guy in TX?" After general conversation DAY responded, "And nah we got took bro I loss 44k in total. Shit sucks. I got another connect though." These conversations occurred at the direction of case agents as case agents directed CS-1 to ask DAY whether DAY could send CS-1 additional cocaine and Adderall pills. Case agents believe that DAY lost $44,000 in drugs and/or drug proceeds to the Texas supplier, but that DAY had an alternate source of supply for DAY's cocaine ("I loss 44k in total. Shit sucks. I got another connect though").

## ii. Corroborating Financial and Airline Records

169. Case agents subpoenaed US Bank records pursuant to this investigation. In part, case agents observed that US Bank business triple cash rewards card ending in X4432, is affiliated with Detail Boys, LLC, a business known through this investigation to be owned and operated by Alex DAY. Based upon the investigation to date, and information obtained from CS-1, case agents know that DAY owns and operates a business called Detail Boys. Additionally, on multiple occasions CS-1 and DAY have discussed DAY's detailing business. DAY frequently posts on various social media platforms about Detail Boys business. Further, case

64

agents have examined numerous bank records, and those records reflect that DAY lists himself as the owner of Detail Boys. DAY is also listed as the sole owner of the bank accounts bearing the name of Detail Boys. A review by case agents of Alex DAY's Facebook page revealed that DAY states that he is the "Owner and Founder of Detail Boys LLC."

170. Case agents noted that on December 4, 2022, DAY's bank account posted a transaction from "American," believed to be American Airlines. A review of the transaction revealed a debit to the account in the amount of $170.60 for Alexander DAY, and the same amount for Miles ARNOLD. Case agents believe this transaction reflects the purchase of airline tickets from Phoenix, Arizona to Los Angeles, California. On December 6, 2022, case agents' review of a separate transaction revealed a debit in the amount of $170.60 for Alexander DAY. Case agents believe that this purchase corresponded to the purchase of an airline ticket from Los Angeles, California to Phoenix, Arizona. On December 9, 2023, in a separate transaction, a review of this account by case agents revealed a debit in the amount of $278.60 for Alexander DAY corresponding to the purchase of an airline ticket from McAllen, Texas to Dallas, Texas; then from Dallas, Texas to Phoenix, Arizona.

171. Case agents have reviewed flight records from United Airlines regarding Alexander DAY, Vanessa OLSON, and Miles ARNOLD. Among other flights, the records indicated that on April 27, 2022, Alexander DAY and Miles ARNOLD departed Phoenix International Airport on a flight destined for Valley International

65

Airport with a connecting flight through Houston, Texas. Case agents know that Valley International Airport is approximately 30 miles from Brownsville, Texas.

172. A further review of United Airlines records revealed that on January 25, 2023, Alexander DAY departed Brownsville/South Padre Island International Airport destined for Phoenix International Airport with a connecting flight through Houston, Texas.

173. United Airlines records further reflect that on May 17, 2023, Miles ARNOLD departed Brownsville/South Padre Island International Airport destined for Phoenix International Airport with a connecting flight through Houston, Texas.

174. Case agents also received flight records from American Airlines regarding Alexander DAY, Vanessa OLSON, and Miles ARNOLD. Among other flights, a review of the records revealed that on March 24, 2022, Miles ARNOLD and Alexander DAY departed Phoenix International Airport destined for Brownsville/South Padre Island International Airport with a connecting flight through Dallas/Fort Worth International Airport. Case agents' review of the flight records revealed that DAY booked the flight with American Airlines, listing ARNOLD as a passenger on this reservation.

175. Case agents' further review of American Airlines records revealed that on March 26, 2022, ARNOLD and DAY departed Valley International Airport destined for Phoenix International Airport with a connecting flight through Dallas/Fort Worth International Airport. The flight records indicate that DAY booked the flight, with ARNOLD listed as a passenger on this reservation.

66

176. Additionally, case agents learned from American Airlines records that on July 11, 2022, ARNOLD and DAY departed Phoenix International Airport destined for Valley International Airport with a connecting flight through Dallas/Fort Worth International Airport. A review of the flight records revealed that DAY booked the flight, with ARNOLD listed as a passenger on this reservation.

177. American Airlines records further revealed that on July 13, 2022, Miles ARNOLD departed Valley International Airport destined for Phoenix International Airport with a connecting flight through Dallas/Fort Worth International Airport.

178. American Airlines records also indicated that on December 8, 2022, Miles ARNOLD departed Phoenix International Airport destined for Brownsville/South Padre Island International Airport with a connecting flight through Dallas/Fort Worth International Airport.

179. American Airlines records further showed that on December 9, 2022, Miles ARNOLD departed Valley International Airport destined for Phoenix International Airport with a connecting flight through Dallas/Fort Worth International Airport.

180. Additionally, American Airlines indicated that on January 22, 2023, DAY and OLSON departed Phoenix International Airport destined for Valley International Airport with a connecting flight through Dallas/Fort Worth International Airport. The flight records indicate that DAY booked the flight, with OLSON listed as a passenger on this reservation.

181.    Finally, American Airlines records further revealed that on May 15, 2023, Miles ARNOLD departed Phoenix International Airport destined for McAllen-Miller International Airport with a connecting flight through Dallas/Fort Worth International Airport. Case agents know that McAllen-Miller International Airport is approximately 60 miles from Brownsville, Texas.

### E.    Vanessa L. OLSON
████ S. Hazelton Lane, Tempe, Arizona

182.    As discussed herein, Vanessa L. OLSON (a/k/a "Vanessa"), a white female born ████, 1991, is a methamphetamine trafficker who obtains this substance for further distribution to mid-level drug traffickers. OLSON resides in the Phoenix, Arizona area, which has been confirmed by investigation, surveillance, and telephone location data. During the course of this investigation, case agents determined that OLSON uses cellular telephone ████-0755 and also utilizes the Signal telephone application which is accessed through her cellular phone.

183.    Case agents confirmed that ████-0755 is subscribed to by ████. As of August 14, 2023, Vanessa OLSON is listed as an authorized user of the account. Based upon the investigation to date, ████ ████ is believed to be the mother of Vanessa OLSON.

184.    Since at least January of 2020, OLSON has been responsible for distributing large quantities of methamphetamine throughout Milwaukee, Wisconsin. OLSON is the on and off girlfriend/fiancé of DAY and assists the DAY DTO with a myriad of tasks. Based upon the investigation to date, case agents believe that DAY and OLSON are not currently in a romantic relationship despite owning

68

the residence located at ███ N. 59th Street, Mesa, Arizona. Case agents are aware that OLSON resided with DAY in the past at this residence but has since moved out.

185.    Case agents queried Arizona Department of Transportation records and observed that OLSON provided an address of ███ N. 45th Place, Phoenix, Arizona, to the Arizona Department of Transportation for her Arizona driver's license.

### i.    OLSON Sent the Package Containing Methamphetamine to Redtail Drive

186.    On February 17, 2023, while the search warrant was being executed at ███████████ Dr., Pewaukee, Wisconsin 53072, investigators from the Washington County Sheriff's Department executed a search warrant subsequent to a controlled parcel delivery at ███ Redtail Dr., Hartford Wisconsin 53027. The parcel had previously been intercepted by investigators from the Washington County Sheriff's Department and United States Postal Inspectors.  After searching the package, case agents found 35 pills that tested positive for the presence of methamphetamine. Case agents learned through the investigation that the parcels sent to ███████████ Dr., Pewaukee, Wisconsin as well as ███ Redtail Dr., Hartford, Wisconsin, were tied to the DAY DTO.

187.    Previously, postal inspectors searched the Postal Service databases and this search revealed that since January 4, 2023, six parcels had been sent to ███ Redtail Dr., Hartford Wisconsin with similar weights and postage paid from the 85206 and 85215 zip codes in Arizona.  Based upon their training, experience and familiarity with the investigation, case agents believe that OLSON sent this package. Case agents' belief was predicated upon the name of the sender, the parcel's

packaging, the similar weights and postage paid for the package, along with historical postal records. Additionally, CS-2 corroborated that OLSON sent packages containing controlled substances to this location.

188. Case agents spoke with CS-1 who stated that after the packages were seized by law enforcement in February of 2023, OLSON sent CS-1 a message via the Signal telephone application that, in part, stated, "I called usps and they said they scanned the package directly in front of the house both of them. (CS-3) and Is deal was that if it says delivered I'd be paid regardless but he only send me half which doesn't even cover my cost. He said your gf was home the entire time and I don't know nor trust someone I've never met. This would be a giant problem for me taking this loss so I just want to make sure everything is handled appropriately and as agreed upon." Based upon their training, experience and familiarity with the investigation, case agents believe that OLSON confirmed that OLSON was the person who sent the packages to CS-1 ("both of them") and that OLSON did not want to take the financial responsibility for the package that was intended for CS-3 ("I just want to make sure everything is handled appropriately and as agreed upon").

### ii. Controlled Buys of Methamphetamine from OLSON

189. From March of 2023 through late January 2024, case agents arranged controlled purchases of "Adderall" (methamphetamine) pills from OLSON utilizing CS-2. For each of these controlled purchases, CS-2 contacted OLSON through the Signal telephone application to arrange the transaction. CS-2 sent money to OLSON via OLSON's PayPal account ██████ Case agents then reimbursed CS-2 using

Waukesha County Drug Task Force buy funds to pay for the pills CS-2 ordered from OLSON at the behest of law enforcement. Once payment was received by OLSON, OLSON sent the requested number of pills to CS-2 through the United States Postal Service to an address CS-2 provided to OLSON, located in the Eastern District of Wisconsin. During this time frame, OLSON facilitated the purchase of approximately 461.4 gross grams of methamphetamine.

190.    For each of the controlled purchases, after payment was received, the process would be constant.  OLSON sent CS-2 a photograph of the USPS shipping receipt that depicted the USPS tracking number. Upon CS-2's receipt of the tracking information from OLSON, CS-2 contacted case agents.  Case agents then notified Inspectors of the parcel's shipment to the requested address in the Eastern District of Wisconsin. Case agents requested that Inspectors intercept the parcel when it arrived at the Milwaukee sorting facility.

191.    Upon arrival at the Milwaukee sorting facility, USPS Inspectors contacted case agents to advise case agents that Inspectors had intercepted the parcel. Inspectors maintained possession of the parcel shipped by OLSON until case agents met with USPS Inspectors to retrieve the parcel shipped to CS-2 by OLSON. Upon meeting with case agents, Inspectors turned over the parcel shipped by OLSON.

192.    After obtaining each parcel, case agents examined the USPS parcel that Inspectors had turned over to case agents. Case agents photographed the parcel, as well as the parcel's label. Case agents then opened the USPS parcel and inspected its

71

contents. Case agents removed the controlled substances which were then weighed and subjected to a field test. For each of the substances obtained from OLSON by CS-2, the substance tested positive for methamphetamine.

**Summary of Controlled Buys in Greater Milwaukee, Wisconsin between CS-2 and OLSON**

| DATE | SENDING NAME AND ADDRESS | DEFENDANT | DRUG TYPE | DRUG WEIGHT |
|---|---|---|---|---|
| March 30, 2023 | S█ H████, █████ E. Keim Street, Scottsdale, Arizona 85032 | Vanessa OLSON | 24 Methamphetamine Pills | 58.1 gross grams |
| May 5, 2023 | J█ W████, █████ E. Mary Sharon Dr., Scottsdale, AZ 85266 | Vanessa OLSON | 37 Methamphetamine Pills | 51.7 gross grams |
| July 7, 2023 | M████ W████, █████ E. Keim Dr. Scottsdale, AZ 85032 | Vanessa OLSON | 28 Methamphetamine Pills | 44.4 gross grams |
| August 29, 2023 | M████ W████, █████ E. Keim Dr. Scottsdale, AZ 85032 | Vanessa OLSON | 33 Methamphetamine Pills | 50.9 gross grams |
| October 4, 2023 | M████ W████, █████ E. Keim Dr. Scottsdale, AZ 85032 | Vanessa OLSON | 50 Methamphetamine Pills | 56.2 gross grams |
| November 10, 2023 | M████ W████, █████ E. Keim Dr. Scottsdale, AZ 85032 | Vanessa OLSON | 50 Methamphetamine Pills | 58.3 gross grams |
| December 14, 2023 | M████ B████, █████ E. Keim Dr. Scottsdale, AZ 85032 | Vanessa OLSON | 50 Methamphetamine Pills | 76.3 gross grams |
| January 30, 2024 | S████ W████, █████ E. Keim Dr, Scottsdale, AZ 85250 | Vanessa OLSON | 61 Methamphetamine Pills | 65.5 gross grams |

### a. March 30, 2023, Controlled Buy

193.    In late March 2023, case agents met with CS-2. During this meeting, CS-2 provided case agents with Vanessa OLSON's cell phone number, ██████-0755. Additionally, CS-2 contacted Vanessa OLSON through OLSON's Signal telephone application, which is tied to OLSON's cellular telephone number ██████-0755. CS-2 sent a message to OLSON that stated, "Hey, sorry! I've got 390 on me total" followed by another message that stated, "Can you send today yet or..?"  OLSON responded, "Let me see what I have left" followed by "I have 24 left." CS-2 replied, "Great! How much??" OLSON answered, "$300 plus shipping" followed by "$329." CS-2 informed OLSON that CS-2 would send the money soon and OLSON replied, "Awesome, I'll send it over around 3:30~4 pm when I get my car back." OLSON then requested that CS-2 send OLSON CS-2's address again, and CS-2 complied.

194.    Case agents supplied CS-2 with $330 in prerecorded U.S. currency for CS-2 to pay OLSON for the purchase of the 24 Adderall pills. CS-2 had sent $330 to OLSON's PayPal account, "████████," and CS-2 was reimbursed using the prerecorded U.S. currency supplied to CS-2 by the case agents.

195.    This package was subsequently seized on March 30, 2023, by case agents as described above. This package contained approximately 58.1 gross grams of methamphetamine pills.

### b. May 5, 2023, Controlled Buy

196.    At the direction of case agents, on May 4, 2023, CS-2 contacted OLSON through CS-2 and OLSON's regular means of communication.  Case agents are aware

that CS-2 and OLSON communicate through OLSON's Signal telephone application number of ███-0755. Previously, on May 3, 2023, OLSON sent messages to CS-2 stating, "Hey babe! Sending out an order tomorrow" followed by another message stating, "I got a hook up. Only 10.00 a piece now."

197.　At the direction of case agents, CS-2 sent a message to OLSON that stated, "Hey! Got $400 so like 37?" CS-2 previously informed case agents that OLSON charged CS-2 for the shipping cost of the pills which usually amounted to $30.00. Consequently, CS-2 only ordered 37 pills instead of 40. Shortly thereafter OLSON responded, "Yea." CS-2 replied, "OK. Will send today." CS-2 stated that this message was meant to inform OLSON that CS-2 would be sending the money to OLSON through OLSON's PayPal account. CS-2 previously indicated to case agents that OLSON knew the address used by CS-2 to receive packages. Accordingly, no need existed for CS-2 to provide a shipping address to OLSON.

198.　Case agents supplied CS-2 with $400 in Waukesha County Drug Task Force prerecorded U.S. currency which was to be utilized to pay OLSON for the purchase of the 37 Adderall pills. CS-2 sent $400 to OLSON's PayPal account of "████," and case agents reimbursed CS-2 with the prerecorded U.S. currency.

199.　Later, on May 4, 2023, case agents received a screen shot from CS-2 depicting a USPS parcel package sent to CS-2 from OLSON. The screen shot, combined with information received from USPS Inspectors, identified the parcel as sent by OLSON at 3:24 p.m. that same day, from a post office in Scottsdale, Arizona. The screen shot also displayed a tracking number, with a listed scheduled delivery

date of May 5, 2023. USPS Inspectors stated that they would monitor the movements of the parcel and intercept it upon arrival to the applicable local sorting facility.

200.    This package was subsequently seized on May 5, 2023, by case agents as described above. This package contained approximately 51.7 gross grams of methamphetamine pills.

### c.    July 7, 2023, Controlled Buy

201.    In early July 2023, case agents again met with CS-2. CS-2 contacted case agents and informed case agents that OLSON contacted CS-2, asking if CS-2 wanted to purchase more "Adderall" pills. While under the supervision of case agents, case agents instructed CS-2 to contact OLSON through their regular means of communication, which is OLSON's Signal telephone application tied to OLSON's known cell phone.  Once the communication concluded, CS-2 forwarded screenshots of the Signal communications to case agents. While case agents were present for the initial portions of the conversation, because OLSON did not respond immediately, CS-2 left the presence of case agents and later sent screenshots to case agents of the communication with OLSON.

202.    Case agents reviewed the screenshots between OLSON and CS-2 that occurred through the Signal telephone application from OLSON's cell phone.  Case agents observed that OLSON had been messaging CS-2 after the last controlled purchase from OLSON in early May 2023. Case agents observed that on Sunday, May 21, 2023, OLSON messaged CS-2, "You still need some?  Still got them for $10.00

each. Prices are looking like they might go back up though. I'll hold these for you for now to get you a good deal." CS-2 did not respond to the message.

203.    Case agents observed that on May 30, 2023, at 11:46 a.m., OLSON messaged CS-2 via the Signal telephone application.  OLSON sent the following to CS-2, "Hey love. I'm going to sell these since I haven't heard from you." Again, CS-2 did not reply to OLSON.

204.    On June 7, 2023, CS-2 messaged OLSON through the Signal telephone application and stated, "Sorry doll…" OLSON replied, "It's okay. Did you need any?" CS-2 did not reply to this message.  On June 20, 2023, OLSON again messaged CS-2 stating, "Got some for 9.00 a piece." Again, CS-2 did not respond to OLSON.

205.    On June 21, 2023, CS-2 messaged OLSON via the Signal telephone application. CS-2 stated, "Light on cash at the moment. Give me a week or two to load up. Hope you're doing well btw." OLSON did not respond until the next day, June 22, 2023, when OLSON wrote, "Thank you."

206.    On July 6, 2023, at 1:23 p.m., while under the direction and control of case agents, CS-2 messaged OLSON through the Signal phone application. CS-2 messaged, "Hey-any chance for some today yet? I've got $350 total." At 1:48 p.m., OLSON replied, "Yes. I can send you 28 of them.  With overnight shipping. I was just about to send some stuff through and I have to Uber to the usps so if you want them you should send asap so I don't miss cut off."  CS-2 did not reply to this message.

207.    At the conclusion of the meeting with case agents, case agents provided CS-2 was provided with $350.00 in Waukesha County Drug Task Force pre-recorded

U.S. currency, as payment to OLSON for 28 Adderall pills. CS-2 later paid OLSON $350.00 via OLSON's PayPal account of ███████." Case agents asked CS-2 to forward screenshots of future communications with OLSON to case agents, reflecting the parcel's movement as well as CS-2's PayPal payment of the $350.00 to OLSON.

208.   At 5:15 p.m. the same day, CS-2 forwarded to case agents a screenshot of a USPS receipt.  This receipt sent to CS-2, via the same message thread on the Signal telephone application, depicted the tracking number and shipping information related to the parcel OLSON sent to CS-2 through the USPS.

209.   Case agents reviewed the receipt, which revealed that OLSON shipped a "Flat Rate Env" destined for an address associated with CS-2 in the Eastern District of Wisconsin, with a scheduled delivery date of July 7, 2023, by 6:00 p.m. The cost of the shipping was $28.75, and the receipt depicted the USPS tracking number. A large portion of the receipt was not captured in the photograph; however, it appeared as if OLSON sent a similar parcel to an address in Burlington, Wisconsin. Case agents were unable to view the shipping information for the Burlington, Wisconsin parcel. Case agents provided the USPS tracking information to USPS Inspectors and requested that Inspectors intercept the parcel destined for CS-2. Case agents later determined that the parcel sent to the address in Burlington, Wisconsin was shipped to Rebecca SHAFFER. See below.

210.   On July 7, 2023, CS-2 forwarded a screenshot of CS-2's $350.00 payment to OLSON via PayPal to case agents. The screenshot depicted a destination PayPal

account of "vanessa olson," and was sent by CS-2 on Thursday, July 6, 2023, at 2:43 p.m.

211.   This package sent to CS-2 was subsequently seized on July 7, 2023, by case agents as described above. The package contained approximately 44.4 gross grams of methamphetamine pills.

212.   On July 13, 2023, case agents met with USPS Inspectors. Inspectors provided case agents with a USPS surveillance video obtained from the USPS location in Mesa, Arizona, dated July 6, 2023. Case agents reviewed this video, and observed that at approximately 2:11 p.m., a black pickup truck arrived in the parking lot. OLSON exited the passenger side of the pickup truck and entered the lobby of the post office. Case agents observed OLSON with two parcels and also what appeared to be a cellular telephone. Case agents' review of the video revealed that OLSON approached the counter at approximately 2:13 p.m. and handed the parcels to the postal worker. OLSON exited the post office and entered the passenger side of the black pickup truck at approximately 2:16 p.m.  Case agents were able to identify Vanessa OLSON through a comparison of her driver's license obtained from the Wisconsin Department of Motor Vehicles and also from comparisons with OLSON's publicly accessible social media accounts.

### d.     August 29, 2023, Controlled Buy

213.   On August 28, case agents met with CS-2 regarding the procurement of "Adderall" pills from Vanessa OLSON.

214. 2. At the conclusion of the meeting with case agents, case agents provided CS-2 with $400.00 in Waukesha County pre-recorded U.S. currency, which was to be utilized to pay OLSON for the pills. CS-2 paid OLSON the $400.00 via OLSON's PayPal account of "████████." Again, case agents asked CS-2 to forward screenshots of the communications with OLSON to case agents reflecting: (1) the conversations between OLSON and CS-2 via the Signal telephone application; (2) the package sent through the United States Postal Service (USPS); and (3) CS-2's PayPal payment to OLSON.

215. On August 24, 2023, CS-2 messaged OLSON, "Hey, I have 400 for some.. Can you send tomorrow--I get that it's close to the cutoff." OLSON responded, "Yeah I got you. Can you send it now?" CS-2 replied "Yep." Simultaneously, CS-2 contacted case agents, who instructed CS-2 to contact OLSON, asking for a different delivery day. CS-2 messaged OLSON, "Crap, Please don't send tomorrow-I'll be out of town I just realized" followed by "If you send Monday, for Tuesday, I'd appreciate it big time."

216. OLSON later responded at 3:28 p.m., "Of course I got you" followed by "That works out way better for me." At 3:39 p.m., CS-2 replied "Perfect! Thank you doll."

217. On August 28, 2023, after meeting with case agents, CS-2 forwarded a screenshot to case agents. CS-2 messaged OLSON, "Still good to send off today? Let me know, thanks!" OLSON responded, "Yes I am" and CS-2 replied, "Thanks a bunch!"

218.    On August 28, 2023, CS-2 forwarded a screenshot of CS-2's $400.00 payment to OLSON via PayPal to case agents. The screenshot depicted a destination PayPal account of "vanessa olson" which was sent by CS-2 on August 24, 2023.

219.    Later, on August 28, 2023, case agents received a screen shot from CS-2 displaying a USPS parcel package sent to CS-2 from OLSON. The screen shot, combined with information received from USPS Inspectors, identified the parcel as sent by OLSON the same day, from a Post Office in Phoenix, Arizona.  The screen shot also displayed a tracking number with a listed scheduled delivery date of August 29, 2023.  USPS Inspectors stated that they would monitor the movements of the parcel and intercept it upon arrival to the applicable local sorting facility.

220.    This package was subsequently seized on August 29, 2023, by case agents as described above. The package contained approximately 50.9 gross grams of methamphetamine pills.

**e.    October 4, 2023, Controlled Buy**

221.    On or about October 2, 2023, at the direction of case agents, CS-2 contacted OLSON via the regular means of communication between CS-2 and OLSON, the Signal telephone application.  CS-2 sent case agents screenshots of the Signal communications between CS-2 and OLSON.

222.    OLSON previously messaged CS-2, "You need any?" at 1:31 p.m.  As a result of the way Signal displays the messages, the exact date this message was sent is unknown.

81

223.     On October 2, 2023, CS-2 sent a screen shot to case agents showing that CS-2 messaged OLSON, "Hey, sorry!! Any chance I can get 50 of them?? Let me know, please! I know I can't send money today so just wanted to lock this in at least for this week."

224.     Later in the day on October 2, 2023, OLSON messaged CS-2, "Yes I got you" followed by "When you thinking?" CS-2 responded, "Tomorrow? Weds before noon at the latest?" Immediately followed by "How much to send?" OLSON responded, "They are $12." CS-2 replied, "Perfect--I'll probably be able to send over the $630 tomorrow in the AM."

225.     On October 3, 2023, CS-2 sent a screen shot to case agents showing that OLSON messaged CS-2, "Hey love! I got them today! I'll send them out right away when you send over the $."

226.     On October 3, 2023, case agents met with CS-2. During this meeting, case agents provided CS-2 with $630.00 in U.S. currency from Waukesha County buy funds, which was to be utilized to pay OLSON for the 50 requested Adderall pills. In the presence of case agents, CS-2 paid OLSON the $630.00 via OLSON's PayPal account of "@volson5." Later that day, CS-2 sent a message to OLSON stating, "Sent the funds! Just let me know when you're able to shoot over the tracking! Thanks." OLSON responded, "You got it buddy! Heading there now to send it out" followed by "What's your address again please?" CS-2 responded with CS-2's address followed by "Thanks so much!!"

227.   Later, on October 3, 2023, case agents received a screen shot from CS-2 depicting a USPS parcel package sent to CS-2 from OLSON. The screen shot, combined with information received from USPS Inspectors, identified the parcel as sent by OLSON that same day, from a Post Office in Mesa, Arizona. The screen shot also displayed a tracking number with a listed scheduled delivery date of October 4, 2023. USPS Inspectors stated that they would monitor the movements of the parcel and intercept it upon arrival to the applicable local sorting facility.

228.   This package was subsequently seized on October 4, 2023, by case agents as described above. This package contained approximately 56.2 gross grams of methamphetamine pills.

### f.    November 10, 2023, Controlled Buy

229.   On October 31, 2023, at 3:41 p.m., OLSON messaged CS-2, "You still doing good?" using the Signal phone application.

230.   At the direction of case agents, on November 6, 2023, CS-2 messaged OLSON through the Signal phone application asking, "Could you send tomorrow or soon?? I was hoping to load-up with like 40-50 if possible depending how much per...Just let me know when you can!!" At 4:19 p.m., CS-2 messaged OLSON, "?" OLSON immediately responded, "Hey sorry yes" followed by "$11.75." At 4:25 p.m., CS-2 responded, "All good! Cool if I confirm in the morning with ya? I'm not home and need to throw cash in my PayPal account anyhow." At 5:30 p.m., OLSON replied, "Yeah that's fine!"

231. On November 7, 2023, case agents met with CS-2. During this meeting, case agents provided CS-2 with $630.00 in Waukesha County Drug Task Force pre-recorded U.S. currency, which was to be utilized to pay OLSON for 50 Adderall pills. CS-2 later paid OLSON $618.00 via OLSON's PayPal account of ████████." Case agents asked CS-2 to forward screenshots of future communications with OLSON to case agents.

232. CS-2 and OLSON then messaged back and forth for the next several days. OLSON explained to CS-2 that OLSON could not meet with OLSON's Adderall supplier until later that week. OLSON told CS-2 that OLSON sent CS-2's money to the supplier and inquired whether CS-2 wanted to wait for the Adderall pills or if CS-2 wanted OLSON to return the money to CS-2. CS-2 informed OLSON that CS-2 would wait for the Adderall pills to be sent to CS-2.

233. On November 9, 2023, case agents received a screen shot from CS-2 depicting a USPS parcel package sent to CS-2 from OLSON. The screen shot, combined with information received from USPS Inspectors, identified the parcel as sent by OLSON that same day, from a post office in Tempe, Arizona. The screen shot also displayed a tracking number with a scheduled delivery date of November 10, 2023. USPS Inspectors stated that they would monitor the movements of the parcel and intercept it upon arrival to the applicable local sorting facility.

234. This package was subsequently seized on November 10, 2023, by case agents as described above. This package contained approximately 58.3 gross grams of methamphetamine pills.

### g. December 12, 2023, Controlled Buy

235. On December 8, 2023, at 3:07 p.m., OLSON messaged CS-2 through the Signal telephone application, "Need any for the holidays?"

236. At the direction of case agents, on December 11, 2023, CS-2 messaged OLSON through the Signal phone application. CS-2 messaged OLSON, "Yes-can I do 50 again? I'll be able to send over money tomorrow morning if that works for you" followed by "Let me know the total when you can-I know the price fluctuates a bit."

237. On December 12, 2023, CS-2 messaged OLSON, "?" Later in the day, OLSON responded, "Hey yes" followed by "Sorry just woke up." CS-2 replied, "All good..How much for 50 to load up before Christmas?" OLSON answered, "$628.00." CS-2 responded, "Ok..Are you able to send them out today yet or when? Just so I know." OLSON eventually responded I can tomorrow for sure."

238. CS-2 told OLSON that CS-2 would send the money over "now then" and asked OLSON to advise CS-2 when OLSON had sent the pills to CS-2.

239. On December 13, 2023, case agents met with CS-2. During this meeting, case agents provided CS-2 with $600.00 in U.S. currency from Waukesha County buy funds, which was to be utilized to pay OLSON for the 50 requested Adderall pills. CS-2 stated that CS-2 had already paid OLSON via OLSON's PayPal account of "███████." CS-2 provided a screen shot of the PayPal transaction to case agents.

240. On December 13, 2023, OLSON sent a message stating, "Waiting for him to drop them off then heading straight to send them out," followed by "probably be around 3-3:30 mountain time" and "It's noon here now." Later in the day, CS-2

85

sent OLSON a message asking, "Have ya sent them yet?? Can you shoot me the tracking please?" OLSON responded, "He still hasn't dropped them off yet" followed by "He said he's almost there" and "I understand no circumstance will forget to send you tracking." CS-2 replied, "Thanks!! Please just let me know! Appreciate it."

241.   On December 13, 2023, case agents received a screen shot from CS-2 depicting a USPS parcel package sent to CS-2 from OLSON. The screen shot, combined with information received from USPS Inspectors, identified the parcel as sent by OLSON that same day, from a post office in Tempe, Arizona. The screen shot also displayed a tracking number with a scheduled delivery date of December 14, 2023. USPS Inspectors stated that they would monitor the movements of the parcel and intercept it upon arrival to the applicable local sorting facility.

242.   This package was subsequently seized on December 14, 2023, by case agents as described above. This package contained approximately 76.3 gross grams of methamphetamine pills.

**h.   January 30, 2024, Controlled Buy**

243.   On January 22, 2024, CS-2 had messaged OLSON "Hey, any chance for more this week?" OLSON replied, "Yes. How many?" to which CS-2 replied, "How much per?" OLSON replied, "Also depends on how many you're getting but I think I can get them for 11.50." CS-2 asked, "Can I get 50? That's $605 total, right?" OLSON replied "Perfect," and CS-2 acknowledged, "K cool." OLSON and CS-2 then communicated regarding when OLSON was sending the package to CS-2. OLSON

86

and CS-2 eventually agreed that OLSON would ship the package to CS-2 on January 29, 2024.

244.    On January 24, 2024, OLSON messaged CS-2 stating, "Okay so he gave me 61 instead of 50 and I don't want some just laying around so if I can give you the extra 11 of them for $11 each would you want to do that? Save you .50 per plus no extra cost for shipping since it's all going together." CS-2 replied, "How much total then? Sent you 605 so just wondering," to which OLSON replied "121."

245.    On January 22 and January 24, 2024, CS-2 forwarded screenshots of CS-2's $605.00 and $121.00 payments to OLSON via PayPal to case agents. The screenshots depicted the destination PayPal account of "vanessa olson" sent by CS-2 on January 22 and January 24, 2024.

246.    On January 26, 2024, case agents met with CS-2 and provided CS-2 with $725 in pre-recorded U.S. currency from Waukesha County buy funds.

247.    Later, on January 29, 2024, case agents received a screen shot from CS-2 depicting a USPS parcel package sent to CS-2 from OLSON. The screen shot, combined with information received from USPS Inspectors, identified the parcel as sent by OLSON that same day, from a post office in Scottsdale, Arizona. The screen shot also displayed a tracking number with a scheduled delivery date of January 30, 2024. USPS Inspectors stated that they would monitor the movements of the parcel and intercept it upon arrival to the applicable local sorting facility.

248.    Case agents later provided CS-2 with $720.00 in Waukesha County pre-recorded U.S. currency, which was to be utilized to pay OLSON for the pills. CS-2

87

paid OLSON $726.00 via OLSON's PayPal account of "███████." Case agents instructed CS-2 to forward screenshots of the communications with OLSON to case agents reflecting the conversations between OLSON and CS-2 via the Signal telephone application.

249. This package was subsequently seized on January 30, 2024, by case agents as described above. This package contained approximately 65.5 gross grams of methamphetamine pills.

### F.   Chauncey HARVEY
███ W. 6th Drive, Mesa, Arizona

250. As discussed herein, Chauncey T. HARVEY (a/k/a "Chauncey" a/k/a "Clec"), a black male born ███████ 1984, is a cocaine and methamphetamine trafficker who obtains these substances for further distribution.  HARVEY resides at ███ W. 6th Drive, Mesa, Arizona, which has been confirmed by investigation, surveillance, and review of utility records.  During the course of this investigation, case agents determined that HARVEY uses cellular telephone ███████-1155, and also utilizes the WhatsApp telephone application which is accessed through his cell phone.  As of January 2024, ███████-1155 is subscribed to by Chauncey HARVEY, with a billing address of ███ W. 6th Drive, Mesa, Arizona.

251. Since at least January of 2020, HARVEY has been responsible for distributing large quantities of methamphetamine to DAY, which is then distributed throughout the greater Milwaukee, Wisconsin area.

88

252. Case agents queried Maricopa County property records, which are publicly available online. Case agents observed that ███ W. 6th Drive, Mesa, Arizona, is currently owned by "HARVEY Chauncey."

253. Case agents queried Arizona Department of Transportation records and observed that HARVEY provided an address of ███ W. 6th Drive, Mesa, Arizona, to the Arizona Department of Transportation for his Arizona driver's license.

### i. Controlled purchase of Methamphetamine between CS-1, DAY and HARVEY corroborates HARVEY as DAY's supplier

254. On October 13, 2023, DAY sent CS-1 a message stating, "You gonna be good today." CS-1 asked, "Who's sending them out? I'm going to need tracking number." DAY responded, "Chauncey, I do a lot of business with him. He's good for it when he does business I'll send tracking." CS-1 replied, "Alright cool! Can he just send me the tracking personally when he's at the post office? Need to make sure I have that and we all know how you are haha." DAY responded, "Yessir it'll be on signal."

255. Later that same day, CS-1 sent DAY a message stating, "So this guys getting these out and sending 100% today? Told people tomorrow." This message was followed by, "You absolutely need to make sure I get tracking. Do not let me fucking down again man." DAY then sent a screenshot with the name "C Note" at the top of the screenshot. The screenshot displayed an address in Milwaukee accompanied by the wording, "This addys." CS-1 replied to this screenshot "Text him and make sure he gets me tracking" followed by "Can I have Chauncey's number bro?"

256.    DAY then sent an audio recorded text message to CS-1 and in this voice text DAY told CS-1 that DAY wanted to "double check" with Chauncey before DAY sent CS-1 his number. DAY further told CS-1 that DAY would connect CS-1 to a group chat with DAY and Chauncey, and DAY would also send Chauncey CS-1's number. Case agents were able to identify Chauncey as Chauncey T. HARVEY through law enforcement databases.

257.    CS-1 responded to the voice text and stated, "Totally get it. Please let me know and keep me updated. If you can put us in a group that would be great. I really need this shit man." CS-1 then sent an additional message stating, "Anyway he can send me 200? If so I won't have to bother you for a bit either. DAY replied, "Gonna have to wait on that can you do 100 for sat delivery and 100 for Tuesday delivery. I know he was light on them but out 100 aside for you. Lmk I'll put you in a group chat." CS-1 responded, "Yeah that would be perfect! Please put us in a group in a couple hours like you said so I can be updated with everything and get tracking as well. Looks like you're traveling today, so will be easier to stay on the same page bro!" DAY stated, "That's fine."

258.    CS-1 then entered a group chat on WhatsApp with DAY, CS-1 and telephone number ████-1155. In the group chat, DAY created the group called "Wi" and added CS-1. In the screenshot sent to case agents by CS-1, the name "Alex DAY" along with telephone number ████-1155 appeared at the top of the chat where the group members are listed. In this group text DAY stated, "Yooo 100 addys to wi. I'm not around but my partners people got you. All info is already sent g." CS-

90

1 replied in the group chat, "Thanks a lot Alex, appreciate it. Please send me tracking when you send it out so I can grab if from my unit."

259.    At 5:43 p.m. on October 13, 2023, "Clec" (the name displayed in the Whatsapp chat), using phone number ███████-1155, sent a message in the WhatsApp group chat that said "sent," followed by a photograph of a USPS shipping receipt with tracking information. CS-1 replied, "Thanks homie, greatly appreciate it. "Clec," using phone number ███████-1155, replied to this with a "thumbs up" emoji. Based upon the investigation to date, case agents believe "C note" and "Clec" (the names displayed on the screenshots associated with telephone number ███████-1155 are HARVEY.

260.    Case agents reviewed the USPS receipt, which indicated that HARVEY's package was a "Flat Rate Env" destined for Milwaukee, Wisconsin, with a scheduled delivery date of October 14, 2023, by 6:00 p.m. The package cost $28.75 to ship and was paid for in cash. The USPS tracking number EI432177795US was affixed to the package, which was sent from Mesa, Arizona. Case agents sent the tracking information to United States Postal Inspectors, along with a request that Inspectors seize the package pursuant to this investigation. Inspectors informed case agents that Inspectors would hold the parcel at the post office until Monday, October 16, 2023.

261.    On October 16, 2023, USPS Inspectors advised case agents that USPS Inspectors now possessed the package sent by HARVEY to CS-1. Case agents then met with USPS Inspectors and retrieved the package.

262. Upon inspection of the package, the sender was listed as "B████ T████, ████ N. Civic Center Plz, Scottsdale, AZ 85251," with CS-1 as the listed recipient. Upon opening the package, case agents found 100 orange, oval shaped pills, consistent with those purchased during previous controlled drug transactions conducted during this investigation.

263. Case agents had served a DEA administrative subpoena on Verizon for cellular telephone number ████-1155. The results of the subpoena revealed that cellular telephone number ████-1155 is subscribed to by Chauncey T. HARVEY, with an address of ███ W. 6th Dr., Mesa, Arizona 85210.

264. On October 17, 2023, case agents met with USPS Inspectors to obtain video from the Mesa, Arizona Post Office from October 13, 2023. Case agents reviewed the video footage obtained, and positively identified the individual who mailed the package to CS-1 on October 13, 2023, as Chauncey HARVEY. Case agents made this identification by comparing HARVEY's Arizona Driver's license photograph, as well as publicly available photographs from HARVEY's Facebook profile.

265. Between October 13 and October 24, 2023, on numerous occasions CS-1 communicated with DAY regarding DAY sending CS-1 an additional 100 pills. On October 24, 2023, CS-1 sent case agents additional screenshots of communications between DAY and CS-1. During these communications, DAY and CS-1 discussed DAY's source of supply (believed by case agents to be HARVEY) and obtaining 1,000

additional pills; however, the pills were in short supply. CS-1 asked DAY to "Elaborate more please on what's going on."

266.    DAY responded with an audio recorded text message on October 24, 2023. Case agents listed to the audio message which had been recorded by CS-1, and during the message DAY stated, "His plug keeps saying hey bro, it's gonna be today, and he's like listen man, on my end they still haven't come through. So, he keeps telling Chauncey, hey it's gonna be today and it's getting harder and harder to get. Where he gets them from, I'm not sure; I guess he gets like 10,000 at a time. He said the supply is getting worse and worse. Like where he used to get 10,000, then he's getting 7,500, now he's getting fucking 5,000, ummm, and he said Chauncey can only get 1,000 at a time now, which remember I was picking up 1,000 myself. So ummm, he keeps telling Chauncey, hey, it will be today, it'll be today, and then he kinda puts him on the back burner. So, I'm just kinda relaying the message to you bro. Unfortunately, like, until Chauncey gets anything, I can't do anything. There's no other people out here that have them, unless you wanna pay extra money, which dude, naaa.  I don't really feel like doing dude, cause I don't make a ton of money on anybody. I usually sell them, you're the cheapest person that gets 'em for obviously at fucking six or whatever. Most people are buying at eight, ten at the very most but like to get all that to make $2 is not worth my efforts or my time dude. And I know you're fucking, got your people that are fucking going, breathing down your neck right now but I don't really know what else to do to help you out dude until Chauncey gets

93

em, which the guy said last night. Now he's telling me today dude, so I'm praying, fingers crossed. I have other people that need them as well."

### ii. HARVEY also supplies cocaine to DAY

267. On January 6, 2024, CS-1 placed a recorded telephone call to DAY. During this call, DAY told CS-1, "My boy said he's got a dude comin in this week dude, so we'll be good to go and I'll get you something. I dunno what day he said he gonna have a whole unit that I'll be able to take care of the full freight of what you need." CS-1 related to DAY that CS-1 was looking to expand CS-1's customer base, and DAY responded, "Dude we gotta just move some fuckin real shit dude." Based upon their training, experience, and familiarity with the investigation, case agents believe that DAY and HARVEY are soon obtaining a kilogram quantity of cocaine and that DAY would, in turn, provide a portion of that kilogram to CS-1 ("he gonna have a whole unit that I'll be able to take care of the full freight of what you need").

268. Later in the conversation, DAY told CS-1 that DAY would be sending a package to CS-1 by "next weekend." DAY reiterated, "He just said like there's a unit comin' in this week dude and he doesn't know when." CS-1 then inquired whether DAY can still "Get those presses" (which case agents know to be ecstasy), and DAY replied "Yea. As many as you want." DAY told CS-1, "I'll stay on him. I'll letcha know (inaudible) in inventory and then we'll wrap it up and get it sent out to you."

269. On January 24, 2024, CS-1 placed a recorded telephone call to DAY. During this call, as DAY and CS-1 discussed a variety of drug related matters, CS-1 asked if DAY's source of supply was still "that Chauncey guy." DAY replied, "It's the

94

Chauncey guy bro. He usually pretty reliable bro, but I know he's kinda goin through some tough times right now dude. So I know he's just trying as much bread as he possibly can so, I mean I think it comes down to a financial thing where he's just tryin' to like 'yo, this is what I got. It is what it is. I'll make sure we get at least some fuckin zips of that shit. The quality is always A-1 with him." Based upon their training, experience and familiarity with the investigation, case agents believe that DAY is currently obtaining quantities of cocaine from HARVEY and DAY is coordinating a shipment of cocaine to CS-1 ("I'll make sure we get at least some fuckin zips of that shit").

### G. Andrew F. PATANAPAIBOON
██ Kirbry Dr., ██, Houston, Texas

270. Andrew F. PATANAPAIBOON (a/k/a "Patana"), an Asian male born ██, 1990, is a methamphetamine and cocaine trafficker who obtains these substances for further distribution to mid-level drug traffickers. PATANAPAIBOON used to reside at ██ Freshwater Way, Apartment ██, Milwaukee, Wisconsin. Case agents have since learned through the investigation that PATANAPAIBOON moved to Houston, Texas, and based on law enforcement databases, PATANAPAIBOON is linked to ██ Kirby Dr., ██, Houston, Texas. Law Enforcement databases list PATANAPAIBOON as associated with this address.

271. Prior to moving to Houston sometime in the fall of 2023, since at least January 2021, PATANAPAIBOON was responsible for distributing large quantities of cocaine and methamphetamine throughout Milwaukee, Wisconsin, which he

95

obtained from DAY and CS-3. PATANAPAIBOON assisted the DAY DTO with distribution of cocaine and methamphetamine throughout the greater Milwaukee, Wisconsin area.

272.    During interviews with CS-1, CS-1 provided the following information regarding Andrew PATANAPAIBOON.

273.    CS-1 stated that CS-1 has known PATANAPAIBOON for approximately seven years and met PATANAPAIBOON through the downtown Milwaukee "club scene." When CS-1 was introduced to PATANAPAIBOON, CS-1 was told by other associates that PATANAPAIBOON was a "drug dealer." CS-1 knew PATANAPAIBOON to be a source of supply for Adderall, cocaine, marijuana, and ecstasy. CS-1 stated that PATANAPAIBOON's prices for the controlled substances were expensive in comparison to other sources of supply in the Milwaukee area.

274.    CS-1 stated that PATANAPAIBOON informed CS-1 that PATANAPAIBOON was planning on moving to Texas, but CS-1 but was unsure if PATANAPAIBOON had actually moved.

275.    Approximately five years ago, CS-1 began frequently purchasing cocaine from PATANAPAIBOON in quantities ranging from 1/8 of an ounce up to one-ounce quantities. CS-1 CS stated that whenever CS-1 was out of cocaine supplied by DAY, CS-1 obtained cocaine from PATANAPAIBOON in whatever quantities of cocaine CS-1 needed in order to fulfill CS-1's customers' requests. CS-1 estimated that CS-1 obtained cocaine from PATANAPAIBOON as frequently as once a month during the

time CS-1 was friendly with PATANAPAIBOON. CS-1 stated that normally these cocaine transactions occurred in the Milwaukee area.

276. CS-1 recalled that PATANAPAIBOON had PATANAPAIBOON's own cocaine source of supply when CS-1 first met PATANAPAIBOON. CS-1 eventually mentioned PATANAPAIBOON to DAY, and then DAY began shipping DAY's cocaine to CS-1 for CS-1 to supply to PATANAPAIBOON. In due course, DAY asked CS-1 to discuss with PATANAPAIBOON if PATANAPAIBOON "wanted in" on routine shipments of cocaine from DAY. CS-1 stated that DAY wanted CS-1 to "recruit" PATANAPAIBOON into DAY's DTO, which CS-1 did not do. From that point on, PATANAPAIBOON began to contact DAY directly to obtain cocaine. As a result, CS-1 did not have specific information regarding PATANAPAIBOON and DAY's cocaine transactions.

277. CS-1 recalled PATANAPAIBOON telling CS-1 that PATANAPAIBOON's drug related communications with DAY became a "shit show." PATANAPAIBOON became unhappy dealing with DAY directly because DAY was "unreliable." CS-1 stated that because of PATANAPAIBOON's difficulty with DAY's unresponsiveness, PATANAPAIBOON stopped dealing directly with DAY to obtain cocaine. PATANAPAIBOON eventually requested that CS-1 order quantities of cocaine from DAY for CS-1 to directly distribute to PATANAPAIBOON. In addition to cocaine, CS-1 knew PATANAPAIBOON routinely obtained Adderall pills from DAY.

278. CS-1 stated that CS-1 and PATANAPAIBOON's communications became significantly less frequent sometime in late 2022. CS-1 estimated that the last drug transaction that CS-1 and PATANAPAIBOON conducted together occurred sometime in 2022. CS-1 stated that to the best of CS-1's knowledge, PATANAPAIBOON continued to obtain "Adderall" pills from DAY.

279. CS-1 stated that during the time CS-1 and PATANAPAIBOON were dealing with each other, CS-1 obtained varying quantities of Adderall pills, cocaine, and ecstasy from both DAY and PATANAPAIBOON. When DAY was unresponsive to either CS-1 or PATANAPAIBOON, CS-1 and PATANAPAIBOON both attempted to obtain controlled substances from DAY. Then, when either CS-1 or PATANAPAIBOON finally received those substances from DAY, PATANAPAIBOON and CS-1 supplied each other with those controlled substances obtained from DAY. CS-1 stated that typically when this occurred, CS-1 or PATANAPAIBOON normally obtained approximately 500 ecstasy pills.

280. CS-1 also stated that there were occasions where CS-1 received parcels from DAY, which DAY would then ask CS-1 to give to PATANAPAIBOON. DAY shipped packages directly to CS-1 and asked CS-1 to turn over the package to PATANAPAIBOON once the package was received by CS-1. Once CS-1 received the package from DAY, CS-1 would not open the package and did not normally know the contents of the package. CS-1 and PATANAPAIBOON then made arrangements for PATANAPAIBOON to retrieve the package. CS-1 stated that DAY normally tracked the package. Therefore, DAY knew when the package arrived. CS-1 stated that most

times, DAY contacted PATANAPAIBOON directly and informed PATANAPAIBOON that the package had arrived at CS-1's residence. For agreeing to receive and forward these packages to DAY's customers, CS-1 received compensation from DAY, usually in the form of various amounts of controlled substances for which CS-1 did not pay.

281. CS-1 stated that if CS-1 communicated directly with PATANAPAIBOON regarding the delivery of these packages, the communication occurred through the Signal telephone application. CS-1 stated that PATANAPAIBOON did not like to communicate outside of the Signal application. PATANAPAIBOON specifically liked the "disappearing messages feature" of the Signal telephone application.

282. On March 2, 2023, case agents received information from USPS Inspectors that a suspicious parcel related to Alex DAY had been located by the USPS Inspection Service. Inspectors provided the specific information to case agents. Inspectors then placed this parcel back into the mail stream in order to further the investigation.

283. Case agents reviewed the information obtained by Inspectors. Case agents observed that this parcel was a Priority Mail Express envelope, shipped on March 1, 2023, and addressed to "Andrew Patana, █ Freshwater Way, █, Milwaukee, WI 53204." The parcel listed the sender as "Alex Day, █ N. 59th Street, Mesa, AZ 85250," and the postage paid was $28.75. Based upon the investigation to date, the parcel matched the characteristics of parcels shipped by DAY which contained controlled substances. Based upon the totality of the circumstances, case

99

agents believe that the intended recipient for this parcel was Andrew PATANAPAIBOON.

284. On March 22, 2023, case agents received information from USPS Inspectors that a suspicious parcel related to the DAY DTO had been located by the USPS Inspection Service. Inspectors documented this parcel and forwarded the information to case agents. Inspectors then placed this parcel back into the mail stream in order to further the investigation.

285. Case agents reviewed the information provided by Inspectors and observed that this parcel was a Priority Mail Express envelope, shipped on March 21, 2023, from a post office in Scottsdale, Arizona. This parcel was addressed to "Andrew Patana, ███ Freshwater Way, ███, Milwaukee, WI 53204." The parcel listed the sender as "Miles Arnold, ███ N. 45th Pl, Phoenix, AZ 85032," and the postage paid was $28.75. Based upon the investigation to date, the parcel matched the characteristics of parcels shipped by DAY which were found to contain controlled substances. Based upon the totality of the circumstances, case agents believe that Andrew PATANAPAIBOON was the intended recipient for this parcel.

286. USPS Inspectors queried postal databases and determined that two additional suspicious parcels related to the DAY DTO had been located by the USPS Inspection Service. Inspectors noted that the first suspicious parcel was mailed from the Mesa, Arizona Post Office on March 3, 2023, and weighed 10 ounces. This parcel was sent to ███ Freshwater Way, ███, Milwaukee, Wisconsin 53204. The second parcel was mailed from the Scottsdale, Arizona Post office on March 9, 2023, and

weighed 9 ounces. This parcel was also sent to ▮ Freshwater Way, ▮,
Milwaukee, Wisconsin 53204. Inspectors determined that each parcels' shipping cost
was $28.75. Based upon the above, case agents deemed these parcels as suspicious
because they contained the same characteristics as similar parcels shipped to the
Milwaukee area by the DAY DTO.

287.    On April 3, 2023, CS-1 received a text message from DAY that stated,
"Please call me back asap pal thanks." CS-1 informed DAY that CS-1 could not talk
at that time but would contact DAY when CS-1 was available. DAY replied, "Yes what
time you think before 4 pm my time?" CS-1 told DAY that CS-1 would contact DAY
around that time. DAY then texted CS-1, "Can I send some addys to your Milwaukee
address for Patana. I have zero other address to send to ona moment notice but." CS-
1 then contacted case agents and asked how CS-1 should respond. Case agents
instructed CS-1 to tell DAY that the address wasn't available at the moment and that
DAY would have to find another address for his use. DAY then asked CS-1 if DAY
could utilize the "Pewaukee address." CS-1 again informed DAY that address was
also unavailable. DAY responded, "I got another address all going," which the CS-1
understood to mean that DAY had found another shipping address for the pills and
no longer needed CS-1's address.   Based upon their training, experience, and
familiarity with the investigation, case agents believe that DAY wanted to send a
parcel containing controlled substances to CS-1 for Andrew PATANAPAIBOON.
Case agents believe that DAY was able to utilize a different address than those
affiliated with CS-1 (i.e., "I got another address all going").

288.   Based upon their training, experience, and familiarity with the investigation, case agents believe these packages contained controlled substances. On Wednesday, May 24, 2023, at approximately 4:40 p.m., CS-1 called DAY at DAY's cellular telephone number ███-1062. At the direction of case agents, CS-1 recorded the telephone call. During this call, summarized below, DAY asked CS-1 to return DAY's call using the Signal telephone application, which CS-1 subsequently did. This Signal telephone conversation was also recorded by CS-1.

289.   During the first call, DAY asked CS-1 if CS-1 talked to "Patana" anymore.  (Case agents believe that "Patana" is Andrew PATANAPAIBOON).  CS-1 informed DAY that CS-1 does not communicate with "Patana" because CS-1 believed that "Patana" had moved to Texas.  CS-1 stated that CS-1 had "ran into him" (Patana) a couple of months ago and that CS-1 believed that "Patana" was planning on moving to Texas once the sale of a business "Patana" was affiliated with occurred.  DAY asked, "But did he move?"  CS-1 advised DAY that CS-1 thought that "Patana" was "bouncing back and forth" (believed by case agents to be between Milwaukee and Texas), but that CS-1 did not know. CS-1 asked DAY why DAY inquired about "Patana," and DAY replied, "This stays between me and you" to which CS-1 agreed.

290.   DAY then stumbled over his words and stated that DAY was "freaking out." DAY continued, "Umm, he fuckin had some federal agents stop at his house because he's been shipping shit, dude, and one of our packages that I shipped him went to a different address.  And somebody signed for it, and like dude, I like, you know Patana, he's so fucking particular. I took a photo of the address it was supposed

102

to be sent to and it was his address and it went to a different address in a different zip code and a guy signed for it. And fucking a week later fucking there's a, like a mail service agent at his fucking apartment asking for his name. Asking hey, do you have a forwarding address for Andrew Patana? So Patana called me, freaks out. I talked to him for a little bit, he's like alright, thanks for calming me down. I'm like I'm sure it's no big deal, just let it blow over, that was like three weeks ago. All of a sudden, he hits me up; he's like yo, I need some fucking Addy's. I'll take 400. I was like alright, cool, no problem, I got x, y, and z left and he tells me he's fucking in France and he's like yeah, looking for a condo out here. And I'm like wait, you moved to France, bro? And he's like yeah, bro. I was like wait, shut the fuck up bro, why, why, how are you still conducting business bro if you are in France? He's like why? I got an operation. Why are you asking so many questions and I'm like dude, you are freaking me out right now dude."

291.    Case agents are aware that on May 5, 2023, USPS Inspectors went to Andrew PATANAPAIBOON's residence, located at ▮▮ W. Freshwater Way, ▮▮▮▮▮▮, Milwaukee Wisconsin 53204. USPS Inspectors inquired with the apartment building management whether PATANAPAIBOON still resided at the apartment complex in Apartment 202. USPS Inspectors requested that the apartment management keep the conversation confidential; however, Inspectors believe that PATANAPAIBOON somehow became aware of the conversation with apartment management. Based upon their training, experience and familiarity with the investigation, case agents believe that during DAY's May 26, 2023, conversation with CS-1, DAY thought

103

PATANAPAIBOON might be cooperating with law enforcement because PATANAPAIBOON "freaks out," but then ordered Adderall pills from DAY ("I need some fucking Addy's, I'll take 400").

292. CS-1 told DAY that CS-1 wouldn't "look too far into it." DAY stated, "Anyways, I got shit going out today, for sure, 100 percent, but I have fucking Addy's for you bro." CS-1 responded, "What's that?" DAY replied, "Call me on Signal" to which CS-1 agreed.

293. On May 26, 2023, CS-1 contacted case agents and informed case agents that DAY had again requested to send a parcel to CS-1 that was for Andrew PATANAPAIBOON. DAY sent CS-1 a message, "Can I send 1 more package to arrive Saturday as well. Just addys, to give to Patana. I'll give you $200 for catching the package. Lmk." CS-1 responded, "Idk man, Was trying to keep it to just my stuff and nobody elses's. Let me get back to you in the morning." DAY replied, "I feel you, really would be helping me out bro. I'll only do it this one time. I just don't want Patana picking the shit up from someone else I trust you. Want to make sure I'm paid in full." The conversation continued, and CS-1 asked, "What's the deal with Andrew then?" DAY responded, "He wants addys." CS-1 asked, "No, would you ship his with mine or do you have another spot?" Really don't want others stuff coming to me, but if yit's this one time I'll do it." DAY responded, "He needs it there tomorrow though." CS-1 replied, "Ahhhh yeah that won't work then." DAY stated, "It's all good he gave me a Mke address."

104

294. On May 27, 2023, case agents received information from USPS Inspectors that a suspicious parcel related to Alex DAY had been located by the USPS Inspection Service. Inspectors documented this parcel and provided the information to case agents. Inspectors then placed this parcel back into the mail stream in order to further the investigation.

295. Case agents reviewed the information provided by Inspectors and learned that this parcel was shipped on May 26, 2023, from the Phoenix, Arizona Post Office and was addressed to "D████ B███, ███ N. Jackson Street, Apt. ███, Milwaukee, WI 53202." The parcel listed "N███ R███, ███ N. 45th Pl, Phoenix, AZ 85032," as the sender. Case agents are aware that this is an address DAY has used in the past to send parcels containing controlled substances. Inspectors noted that the shipping cost for the parcel was paid in cash. Based upon the investigation to date, as well as the conversation where DAY stated, "It's all good he gave me a Mke address, "case agents believe that the intended recipient for this parcel was Andrew PATANAPAIBOON.

### H. Rebecca J. SHAFFER
### ██ N. Pine Street, ███, Burlington, Wisconsin

296. As discussed herein, Rebecca J. SHAFFER, a white female born ███ ██, 1988, is a methamphetamine trafficker who obtains this substance from OLSON for further distribution to mid-level drug traffickers. SHAFFER resides at ██ N. Pine Street, ███, Burlington, Wisconsin, which has been confirmed by investigation, and surveillance. During the course of this investigation, case agents determined that SHAFFER uses cellular telephone ██████-3281.

297. Since at least June of 2022, SHAFFER has been responsible for receiving and distributing large quantities of methamphetamine throughout the greater Milwaukee, Wisconsin area. These quantities of methamphetamine are supplied to SHAFFER by OLSON.

298. Case agents checked with WE Energies and this check revealed that Rebecca SHAFFER is the subscriber for WE Energies services at ██ N. Pine St, ██, Burlington, Wisconsin. This account was established on April 27, 2012, and current as of February 9, 2024, with a contact telephone number of ██████-3281.

299. Case agents queried Wisconsin Department of Transportation records and observed that SHAFFER provided an address of ██ N. Pine St, ██, Burlington, Wisconsin, to the Wisconsin Department of Transportation for her Wisconsin driver's license. In addition, SHAFFER drives a 2019 Land Rover, bearing Wisconsin Registration ██████ registered to her at ██ N. Pine St, ██, Burlington, Wisconsin, which expires on March 31, 2024.

300. Case agents queried numerous public and law enforcement databases and determined that information contained in these databases contained information that SHAFFER is associated with the residence ██ N. Pine St, ██, Burlington, Wisconsin. Additionally, a review of records obtained from the United States Postal Service revealed that SHAFFER is receiving mail at ██ N. Pine St, ██, Burlington, Wisconsin.

301. In July of 2023, United States Postal Service Inspectors began closely monitoring USPS parcels suspected to have been sent by members of the DAY DTO.

Inspectors conducting the analysis contacted case agents and informed case agents of their suspicions regarding ███ N. Pine St., Apartment ███, Burlington, Wisconsin. Case agents are aware through this investigation that this address is affiliated with SHAFFER.

302.    Inspectors analyzed historical package details associated with ███ N. Pine St., Apartment ███, Burlington, Wisconsin.  Inspectors notified case agents that beginning on June 3, 2022, and continuing through January 8, 2024, at least 25 suspicious parcels believed to be related to the DAY DTO had been identified by the USPS Inspection Service. These parcels had been mailed from various post offices in the Phoenix, Arizona area, and sent Priority Mail Express. Each of these parcels were roughly the same weight and roughly the same shipping cost. Based upon the investigation to date, these parcels matched the characteristics of parcels shipped by the DAY DTO, some of which were found to contain controlled substances pursuant to warrants and/or controlled buys.  Based upon their training, experience and familiarity with the investigation, case agents believe that the intended recipient for these parcels was Rebecca SHAFFER.

303.    For example, on July 7, 2023, USPS Inspectors notified case agents that Inspectors located a suspicious parcel in the mail stream, addressed to "Becki Shaffer, ███ N. Pine St., Apartment ███, Burlington, WI 53105." The package listed "M██ W████, ███ E. Keim Dr., Scottsdale, AZ 85032," as the sender, which case agents know to be a sender address frequently used by OLSON. In addition, case agents learned that telephone number ███-3281 was tracking this package. As set forth

above, a query of law enforcement and public databases revealed that ███████-3281 is associated with SHAFFER. This package was documented by USPS Inspectors, returned to the mail stream, and delivered to ███ N. Pine St., Apartment ███, on July 7, 2023.

304. Additionally, on August 18, 2023, USPS Inspectors notified case agents that Inspectors located a suspicious parcel in the mail stream addressed to "Becki Shaffer, ███ N. Pine St., Apartment ███, Burlington, WI 53105," with a listed sender of "M███ W████, ███ E. Keim Dr., Scottsdale, AZ 85032." Case agents are aware that this is a sender address frequently used by OLSON. This package was documented by USPS Inspectors, returned to the mail stream, and delivered to ███ N. Pine St., Apartment ███, on August 18, 2023. Case agents conducted a telephone toll analysis of OLSON's cell phone and this review revealed that OLSON placed calls to ███████-3281, a telephone number believed to be used by SHAFFER, on August 10 and 11, 2023.

305. In addition, on September 12, 2023, USPS Inspectors notified case agents that Inspectors had located a suspicious parcel in the mail stream, sent to "Becki Shaffer, ███ N. Pine St., Apartment ███, Burlington, WI 53105." The sender was listed as "M███ W████, ███ E. Keim Dr., Scottsdale, AZ 85032." This package was documented by USPS Inspectors, returned to the mail stream, and delivered to ███ N. Pine St., Apartment ███, on September 13, 2023.

306. Later in the day on September 13, 2023, USPS Inspectors conducted surveillance at ███ N. Pine St., Apartment ███, Burlington, Wisconsin 53105, the

x

108

x

x

x

x

x

residence of SHAFFER. At approximately 12:37 p.m., Inspectors observed the postal carrier place the suspect package into SHAFFER's mailbox. At approximately 3:20 p.m., Inspectors observed a female matching the description of SHAFFER exit the residence at ███ N. Pine St., Apartment ███, go to the mailbox, and remove all the mail which included the suspect package. After walking away from the mailbox, Inspectors observed the female re-enter apartment ███. Inspectors photographed this female, and observed that the female resembled SHAFFER, but were unable to say with absolute certainty that this female was in fact SHAFFER.

307. On November 8, 2023, USPS Inspectors notified case agents that Inspectors had located another suspicious parcel in the mail stream which was which was addressed to "Becki Shaffer, ███ N. Pine St., Apt ███, Burlington, WI 53105." The sender was listed as "M███ W███, ███ E. Keim Dr., Scottsdale, AZ 85032." USPS Inspectors seized this parcel.

308. On November 9, 2023, USPS Inspectors applied for and obtained a search warrant for this parcel. Later that day, the parcel was searched pursuant to the search warrant, and contained 75 pink or orange colored, round shaped pills that weighed approximately 53.3 gross grams. These pills tested positive for the presence of methamphetamine.

309. On December 12, 2023, USPS Inspectors notified case agents that Inspectors had located a suspicious parcel in the mail stream, addressed to "Becki Shaffer, ███ N. Pine St., Apt ███, Burlington, WI 53105." The sender was listed as "D███ P, ███ E. Keim Dr., Scottsdale, AZ 85250," which case agents know to be

109

another sender address frequently used by OLSON. This parcel was packaged in a USPS Priority Mail Express Box, whereas the previous parcels shipped by OLSON were in USPS Priority Express Envelopes. The shipping cost for this parcel was $48.75. This package was documented by USPS Inspectors, returned to the mail stream, and delivered to ██ N. Pine St., Apartment ██, on December 12, 2023. Based upon their training, experience, and familiarity the investigation, case agents believe that OLSON changed the normal shipping method of this particular parcel from a USPS Envelope to a USPS box, and likewise changed the name of the sender in an effort to thwart law enforcement as a result of the November 8, 2023, parcel seizure.

310. USPS Inspectors queried postal records, and discovered that on January 8, 2024, a parcel was sent from the Tempe, Arizona Post Office to ██ N. Pine St., Apartment ██, Burlington, Wisconsin. The shipping cost of this parcel was $28.75 and paid for in cash. Based upon the investigation to date, and the similarities of this parcel to the other parcels sent to SHAFFER, case agents believe that this parcel was sent to SHAFFER by OLSON and contained a controlled substance.

## V. COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

311. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal

Rules of Criminal Procedure permits the government to search and seize computer hardware and software which are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

312. To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs. I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

313. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

111

314. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

Case 2:24-mj-00337-SCD   Filed 02/22/24   Page 113 of 125   Document 7

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

315.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or

edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies,

114

transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images

stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

116

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.    I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used

as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

316. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires

considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

317.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

318.   Because multiple people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

319.   *Unlocking Apple brand devices:* I know based on my training and experience, as well as from information found in publicly available materials including those published by Apple, that Apple devices are used by many people in the United States, and that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

a. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

b. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via

121

Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

c.   If Touch ID enabled Apple devices are found during a search of the PREMISES, the passcode or password that would unlock such the devices are presently unknown to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of any Apple device(s) found during the search of the PREMISES to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

d.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock

122

the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the premises to press their finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of the PREMISES in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

e.  Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Apple device(s) found in the PREMISES as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

320. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the PREMISES to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found at the PREMISES for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

## VI. CONCLUSION

321. Based on the forgoing, I believe there is probable cause to believe that the following individuals have and are committing violations of federal law, including Title 21, United States Code, Sections 841 and 846; and Title 18, United States Code, Section 2. These individuals are: Chauncey T. HARVEY, Alexander M. DAY, Vanessa L. OLSON, Miles T. ARNOLD, Andrew F. PATANAPAIBOON, and Rebecca J. SHAFFER. I further believe that there is probable to believe that located at and in the property described in Attachment A, there is evidence of drug trafficking, and fruits, instrumentalities and proceeds of drug trafficking, all of which is detailed more specifically in Attachment B, Items to be Seized.